**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**DORN'S TRANSPORTATION COMPANY, Inc., Respondent.**

**No. 181, Docket 32557.**

United States Court of Appeals Second Circuit.

Argued Nov. 15, 1968.

Decided Jan. 9, 1969.

Eugene B. Granof, Atty., N. L. R. B. (Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, and Jonathan M. Marks, Atty., N. L. R. B. on the brief), for petitioner.

William Biederman, New York City (Harris J. Klein, New York City, on the brief), for respondent.

Before MEDINA, FRIENDLY and SMITH, Circuit Judges.

J. JOSEPH SMITH, Circuit Judge:

This is a petition by the National Labor Relations Board for enforcement of its order of November 27, 1967, 168 NLRB No. 68 (1967) against respondent Dorn's Transportation Company, Inc., pursuant to Section 10(e) of the National Labor Relations Act, 29 U.S.C. § 160 (e) (1964).

The Board found that the Company violated Section 8(a)(3) of the Act[1] by discriminatorily discharging employees Richard Rogers and Alvin Weiss. The Board also found that the Company violated Section 8(a)(1) of the Act[2]

---

1. Section 8(a) (29 U.S.C. § 158(a)).
   It shall be an unfair labor practice for an employer—
   (3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization * * *

2. Section 8(a) (29 U.S.C. § 158(a)).
   It shall be an unfair labor practice for an employer—
   (1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title.

by coercively interrogating certain of its employees about their union activities and by withholding salary increases because of a union organizing campaign.

Respondent maintains that enforcement should be denied because the Board's findings are not supported by substantial evidence as required by the Act. Respondent further maintains that its discharge of Rogers and Weiss for refusal to work overtime, and its withholding of salary increases during the pendency of an election petition were justified, and that its interrogation of employees concerning union membership is protected by the Act. We find that there is substantial evidence in the record as to the discriminatory discharges and grant enforcement of that portion of the order. We deny enforcement as to the other claimed violations.

The facts were established at a hearing on May 17 and 18, 1967, before Trial Examiner John F. Funke.

*The 8(a) (3) Violations*

Respondent Company is a trucking firm which maintains its home office and a freight terminal in Albany, New York, and which is a party to a master agreement with the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America covering its drivers, helpers and dockmen. The Company also employs about fifty office and clerical employees at its Albany offices, none of whom were represented by a union when the alleged unfair labor practices herein occurred, during a campaign by the Teamsters to organize the office help.

Rogers and Weiss were office employees in the Company's Traffic Department, located in the terminal office building.

It had become a working arrangement for employees from the Traffic Department to "fill in" for terminal employee Leroy Rexford during his vacation. Since the Traffic Department employees were not sufficiently familiar with Rexford's duties and since Rexford worked from 3:00 to 11:00 p. m., performing Rexford's work meant overtime duty for two men from the Traffic Department. The assignments had always been done on a voluntary basis, with the exception that employee Weiss, who was known by management to be working nights at another trucking company, was not expected to and did not work overtime.

In the Spring of 1966 Assistant Traffic Manager Colabelli prepared a vacation schedule which indicated that Rexford would be on vacation from May 31 through June 7 and from October 24 through October 28, with the footnote:

It is assumed that Glen Handy, Harold Zeh, Dick Rogers and Larry Schneider will cover for Rexford while he is on vacation. We may have problems with Larry Schneider's schedule since Jane, his wife, is expecting sometime in May. We will cross this bridge when we get there.

Rexford's first vacation period passed without difficulty. However, on September 19, five weeks prior to Rexford's second vacation period, Rogers wrote and delivered the following note to Colabelli:

I am working every night for State Photo Corp. in Albany—therefore I will not be able to fill-in for Rex. The last night I will be available for "emergency" fill-ins is Tuesday, 9–20–66.

At about this time employee Schneider advised Colabelli that he would not work overtime, although he was willing to work Rexford's usual shift.

On October 4, 1966 Colabelli discussed the problem of finding replacements with his superior, Clifford Carter, General Traffic Manager. Subsequently, on Carter's suggestion, Colabelli wrote a note to Earl Butts, Manager of the Albany Terminal which stated:

*Re*: Rex's vacation 10/24–10/28

The only available persons to cover this period are Glen Handy and Harold Zeh. They can work only Monday, Wednesday and Friday.

· *The others*:

*Dick Rogers* has an evening job. See Photo-stat.

*Al Weiss* likewise.

Larry Schneider—not available.*

\* Will cover Rex only if he can come in @ 3 p. m.
 Will not work day & night.

It is about this time that Rogers' union activities became visible. In late September Rogers had a conversation with Lamberson, shop steward for the Company's drivers, and agreed with Lamberson to take Teamsters' membership cards to distribute among the office and clerical employees. Rogers received the blank union authorization cards on October 3 or 4, and during the next couple of days openly solicited about forty of the fifty employees in the clerical unit. Included among these employees were Ellen Thompson, secretary to Traffic Manager Carter, and Betty Cramer, who told Rogers that she was President Dorn's private secretary and was thus not allowed to sign cards.

Meanwhile Butts, on receipt of Colabelli's note of October 4, took up the problem of Rexford's replacement with Walter Dorn, the Company's President. Dorn called Carter in New York City where he was attending a rate meeting, on October 5, and told Carter that he had a matter to discuss at the earliest possible opportunity. After going to Baltimore on October 6, Carter returned early on the 7th of October and met with Dorn.

The conversation at this meeting, as related by Carter, concerned the replacement problem, and in particular Rogers' refusal to work overtime, and his career with the Company. Dorn, according to Carter, "said that this is something that he can not tolerate, any of these men not willing to step in and put a shoulder to the wheel when we needed them. If that was Dick Rogers' attitude * * * we have no place for him and he must be discharged." Carter then advised Dorn that, to be consistent, there was another employee, Weiss, who had never worked overtime and had indicated that he was unavailable, whereas Rogers had in the past worked nights in emergencies and on vacations. At this point Dorn, according to Carter, said that "if Al Weiss is in the same category you must release him too."

On October 7, Rogers and Weiss were summoned to Carter's office along with Colabelli. The two employees were handed their paychecks and told by Carter that they were being discharged for refusing to fill in and work overtime when Rexford was on vacation. Weiss testified that he asked whether this meant that they now had to work overtime in the terminal, and that Carter replied, "This is it, it's out of my hands. Walter Dorn made up his mind and once a stubborn Dutchman makes up his mind—" Carter testified that he "did say to Al Weiss that * * * he was somewhat a victim of circumstances and it was known that he had this other job and we never made an issue of it."

On November 3, Weiss and Rogers set up a picket line outside the Company's offices, protesting their discharge. The picket line was honored by the union employees as well as most of the clerical employees.

On November 12, Company President Dorn wrote a letter to Weiss advising him that his discharge had been reconsidered, and that he could report for work on November 14, and would be compensated for all unpaid time from the date of the discharge, with the following explanation:

You were separated because I was advised that you failed to make yourself available for emergency fill-in duty. In further discussion of the matter with your department heads I am informed that you never directly refused a request to cooperate with the company's requirements.

Weiss returned to work on November 16 with the other strikers, and received full reimbursement for the time lost.

Rogers, however, received neither an offer of reinstatement nor reimbursement.

The Trial Examiner found that Rogers was discharged for his union activities in violation of Section 8(a) (3) of the Act. The Examiner reasoned that considering the size of the unit of employees and the opportunity of supervisors to observe Rogers' activity, it was reasonable to infer that the Company had early knowledge of his union activity. The Trial Examiner rejected as not credible the reason given for Rogers' discharge, since although the Company had knowledge of his unwillingness to work overtime on September 19, the Company tolerated and took no notice of it until October 4, the day after Rogers began soliciting employees. Another factor influencing the Examiner was the difference in post-discharge treatment of Weiss and Rogers:

> The discharge of Weiss, of course, was in the nature of an afterthought for the penalty, at first, was to be directed only to Rogers. It was only when Carter reminded Dorn that Weiss had consistently refused to work overtime that Weiss was included. Weiss, whose union activity consisted simply in signing a card, was reinstated and reimbursed while Rogers was not.

The Trial Examiner thought it would not serve any purpose to make a finding with respect to Weiss, since Weiss had been reinstated with back pay. The Board disagreed, and concluded that since Weiss had been discharged so that the "treatment afforded both men would be consistent," the discharge of Weiss also violated Section 8(a) (3).

### The 8(a) (1) Violations

The Board also found, contrary to the Trial Examiner, that the Company interfered with the Section 7 rights of its employees by engaging in coercive interrogation and by withholding salary increases because of the union organizing campaign.

The day after Weiss and Rogers were discharged, Carter called into his office Margaret Del Ross, a supervisor in the interline department, and asked her if the girls in her office had joined the union. Del Ross did not know, so she asked Kira Aldra, an employee in her department whom she had known for seventeen years, whether she had joined the union. Aldra "said no and me [Del Ross] of my own accord, I went in and told Mr. Carter that I didn't think so."

Employee Hewitt testified that he had an equally brief conversation with John Curran, manager of the claims department, regarding union membership: "A week or so later he—as I recall asked me if I signed a card and I said to him, 'No.' "

Office employee John Allen testified as follows with respect to a conversation with Office Manager Lindquist:

> Two days before the first picket. I went in to inquire to Mr. Lindquist if I was going to get a raise and he said, "No" and I said, "Is anybody going to get a raise?" And he said, "No, because of Union problems." He asked me if I signed a card and I told him I didn't think it was any of his business and he in turn said, "You did sign a card." I told him, "Yes and who told you?" And he told me that you realize by signing a card you are going to pay seven dollars a month to the Union so * * * the Business Agent, can drive around in a Cadillac.

Employee Candace Ashdown testified that she asked for a raise about December 7, and in response she was called to Carter's office and told that if she hadn't been with the picketing strikers, she would have gotten the raise, and if the Union didn't go through, she might still get a raise. The Trial Examiner, however, instead credited Carter's contrary testimony that he did no more than tell Ashdown that she could not receive a wage increase pending settlement of the "union problem." Carter had also testified that Dorn feared that the granting of a raise might be construed as an attempt to influence an employee, in light of the complaint pending against the Company.

The Trial Examiner concluded that the interrogation was not coercive, and that no violation of 8(a) (1) had been established. Applying the criteria set forth in Bourne v. NLRB, 332 F.2d 47, 48 (2 Cir. 1964),[3] he found no background of employer hostility and discrimination, no evidence that the interrogator appeared to be seeking information on which to take action against any individual employee, no atmosphere of unnatural formality in the place and method of interrogation, and further that the questioners were at the lowest level of the supervisory hierarchy and were on friendly terms with the employees, and that the answers given by the employees appeared to have been truthful. Concerning the withholding of wages, the Examiner credited Carter's testimony, supported by Del Ross, that the Company feared that a raise might be construed as an attempt to influence an employee, and that Carter did no more than tell Ashdown that they would like to give her an increase but "because of the situation and the Complaint pending against us I can't do anything until this matter is settled."

The Board disagreed with the Trial Examiner's conclusions, stating:

In view of the number of employees involved, the identity of the questioners who occupied positions at various levels of the Respondent's hierarchy, the absence of any assurances against reprisal or legitimate purpose for the the questioning, and the other unfair labor practices engaged in by the Respondent, we find that this interrogation of employees concerning their union activities and sympathies tended to interfere with, restrain, and coerce the employees in the free exercise of their right to select a bargaining representative, and therefore violated Section 8(a) (1) of the Act.

We also find that the Respondent violated the Act when Carter advised Candace Ashdown that, although the Company ordinarily reviewed salary increases during the latter part of the year, she could not be given a raise until the "situation" was settled and when John Allen was told by Lindquist that nobody would receive a raise because of union problems. By withholding salary increases, which it would have granted had there been no organizing campaign and so advising its employees, the Respondent restrained and coerced its employees and thereby violated Section 8(a) (1) of the Act. This is so despite the fact that the Respondent may have believed that it could not grant any raises because of a pending election petition.

## I.

Section 8(a) (3) of the Act makes it an unfair labor practice for an employer to discourage membership in any labor organization by discrimination in regard to hire or tenure of employment. 29 U.S.C. § 158(a) (3). Since this section does not limit the right of an employer to discharge an employee for genuine economic reasons or for just cause, e. g., disobedience or poor work, NLRB v. Jones & Laughlin Steel Corp., 301 U.S. 1, 45–46, 57 S.Ct. 615, 81 L.Ed. 893 (1937), the issue on appeal is whether there is substantial evidence on the record as a whole supporting the Board's conclusion that the employees were discharged because of the employer's improper motive to discriminate and discourage union membership. Textile Workers Union of America v. Darlington

3. These include:
    (1) The background, i. e. is there a history of employer hostility and discrimination?
    (2) The nature of the information sought, e. g. did the interrogator appear to be seeking information on which to base taking action against individual employees?
    (3) The identity of the questioner, i. e. how high was he in the company hierarchy?
    (4) Place and method of interrogation, e. g. was employee called from work to the boss's office? Was there an atmosphere of "unnatural formality"?
    (5) Truthfulness of the reply.

Mfg. Co., 380 U.S. 263, 85 S.Ct. 994, 13 L.Ed.2d 827 (1965); Universal Camera Corp. v. NLRB, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951).

We agree with the Board's finding and conclusions concerning the 8(a) (3) charges. Even assuming that Rogers' failure to volunteer to work overtime was a valid cause for dismissal, the Board was justified in finding that this ground alone did not motivate the Company. NLRB v. L. E. Farrell Co., 360 F.2d 205, 208 (2 Cir. 1966). Rogers was the first and only union organizer of the office employees. The plant was small and Rogers' activity open and extensive, including approach to Dorn's and Carter's secretaries. It was reasonable to infer that the Company had early knowledge of his activities. He was abruptly discharged shortly after these activities commenced. He was not given the opportunity to choose between working overtime or dismissal. "The abruptness of a discharge and its timing are persuasive evidence as to motivation." NLRB v. Montgomery Ward & Co., 242 F.2d 497, 502 (2 Cir.), cert. denied 355 U.S. 829, 78 S.Ct. 40, 2 L.Ed.2d 41 (1957). The existence of a valid ground for discharge is not a justification when it is a mere pretext, nor when the discharge is not solely on this ground, but partly on an impermissible ground. NLRB v. Symons Mfg. Co., 328 F.2d 835, 837 (7 Cir. 1964); NLRB v. Gass, 377 F.2d 438, 443 (1 Cir. 1967). Dorn's attitude was critical on the question of the motivation of the discharge, and the failure to call him as a witness on the issue of what he thought of Rogers' loyalty and attitude toward his work permits an adverse inference, in the light of the other circumstances here present. Interstate Circuit v. United States, 306 U.S. 208, 225–226, 59 S.Ct. 467, 83 L.Ed. 610 (1939); Vanity Fair Paper Mills, Inc. v. F. T. C., 311 F.2d 480, 485–486 (2 Cir. 1962). "Evidence of such a 'fact' may consist both of direct testimony by the one whose motive is in question and of inferences of probability drawn from the totality of other facts." NLRB v. Park Edge Sheridan Meats, Inc., 341 F.2d 725, 728 (2 Cir. 1965). Rogers was an employee of some eleven years standing. He was fired ostensibly for unwillingness to do something he was not obliged to do, without giving him a chance to change his mind in light of the consequences. Weiss was fired with even less excuse just to give an appearance of consistency, and was shortly rehired with back pay. Rogers, in spite of his long service, was refused a letter of recommendation.

Considering all the circumstances, the Board properly found that the ground stated by the Company would not alone have led to the discharge, and that the discharge of Rogers was motivated by impermissible discrimination. We agree with the Board's finding that Weiss' discharge was motivated by the Company's desire to be consistent in their pretext for dismissing Rogers, and thus also violated Section 8(a) (3). See Wonder State Mfg. Co. v. NLRB, 331 F.2d 737, 738 (6 Cir. 1964).[4]

## II.

Section 8(a) (1) of the Act makes it an unfair labor practice for an employer to interfere with, restrain or coerce employees in the exercise of their rights to self-organization and collective bargaining. 29 U.S.C. § 158(a) (1).

The Board did not find that the interrogation of employees was coercive in itself. Since an employer has the right to interrogate employees with respect to union organization purely for informational purposes, NLRB v. Great Atlantic & Pacific Tea Co., 346 F.2d 936 (5 Cir. 1965), we have held that interrogation, not itself threatening, is not an unfair labor practice unless it meets certain fairly severe standards. Bourne v. NLRB, supra. See footnote 3, supra. These include a background of

4. Since Weiss has already been reinstated with back pay, the Board correctly concluded that it would not further the policies of the Act to issue a remedial order with respect to him.

employer discrimination and demonstration that the circumstances of interrogation would induce fear of reprisal. NLRB v. D'Armigene, Inc., 353 F.2d 406, 411 (2 Cir. 1965). The Trial Examiner explicitly reviewed the evidence in the instant case and found that none of the criteria set forth in *Bourne* were established by the evidence.

■ The record does not support the Board's contrary conclusion, i. e., that the surrounding circumstances, taken as a whole establish that the interrogation threatened discrimination against union activity or otherwise coerced or discouraged membership in the union. NLRB v. Montgomery Ward & Co., 192 F.2d 160, 163 (2 Cir. 1951); Federation of Union Representatives v. NLRB, 339 F.2d 126, 131 (2 Cir. 1964).

■ Interrogation, not coercive in itself, does not become coercive merely because the employer is guilty of other unfair practices. Federation of Union Representatives v. NLRB, supra; Bourne v. NLRB, supra.

■■ Other factors relied upon by the Board are similarly not dispositive. The absence of assurances against reprisal or of a legitimate purpose for questioning does not tend to render the interrogation coercive absent a history of anti-union animus. NLRB v. Arthur Winer, Inc., 194 F.2d 370 (7 Cir.), cert. denied 344 U.S. 819, 73 S.Ct. 15, 97 L. Ed. 638 (1952); NLRB v. Superior Co., 199 F.2d 39, 43 (6 Cir. 1952). The Trial Examiner's explicit finding that there was no such history of employer hostility or discrimination is supported by evidence, and was not controverted by the Board.

■ Similarly, the identity of the questioners and number of employees involved does not, in this case, militate toward a finding of coercion. These factors would only be relevant if they indicated that the interrogation coerced or discouraged membership in the union. Quite the contrary, however, the inference of the absence of coercion is strengthened by the facts that the termi-

nal employed only fifty office employees, and that these employees spoke freely to the supervisors, with whom they were and remained on friendly terms. NLRB v. Arthur Winer, supra.

The "interrogations" were brief, informal, and not in themselves coercive. The Board has failed to demonstrate that the standards set forth in *Bourne* have been met, and the record does not support such a finding in the face of the Examiner's contrary conclusion.

### III.

Neither the record nor the cases cited by the Board support its holding that the Company violated Section 8(a) (1) by withholding salary increases.

The Trial Examiner's findings, not controverted by the Board, were as follows:

I have already made credibility findings favoring Carter's testimony, supported by Del Ross, that he did no more than tell Ashdown that she could not receive a wage increase pending settlement of the "union problem." At this time there was pending Respondent's petition for an election and nothing could be clearer than that, had Respondent granted a wage increase, the General Counsel would have alleged such action a violation of Section 8(a) (1) * * *

The wage increase denied in this case was not contingent on the employee's union membership or lack thereof nor was any promise of a future wage increase contingent [upon] membership or surrender of membership. It was denied, after consultation with Respondent's attorney, on the ground that it might constitute an unfair labor practice.

■ The Trial Examiner correctly noted that the *granting* of economic benefits by the unilateral action of an employer while union organizational efforts are underway, or while a representation election is pending, is a violation of Sections 8(a) (1) and 8(a) (5). NLRB v. Exchange Parts Co., 375 U.S.

405, 84 S.Ct. 457, 11 L.Ed.2d 435 (1964); NLRB v. Katz, 369 U.S. 736, 82 S.Ct. 1107, 8 L.Ed.2d 230 (1962). It would thus be hardly logical to hold the Company guilty of an unfair labor practice *solely* for *withholding* economic benefits under the same circumstances. Such a "damned if you do, damned if you don't" approach by the Board does not further the policies of the Act.

■ The broad purpose of Section 8(a) (1) is to establish "the right of employees to organize for mutual aid without employer interference." Republic Aviation Corp. v. NLRB, 324 U.S. 793, 798, 65 S.Ct. 982, 985, 89 L.Ed. 1372 (1945). The issue under the Act is therefore whether in form and in purpose the withholding or conferring of economic benefits was to discourage and frustrate the statutory right of employees freely to organize and bargain collectively.

■ The present case presents no such interference with protected rights. The evidence relied upon by the Board consists of two conversations initiated by employees at a time when granting a wage increase would invite the charge that the Company was seeking to weaken the position of the union. This is not a situation where the employer has by public announcement specifically advised the employees that the union is causing them to lose a wage increase they would otherwise have received. Compare NLRB v. Agawam Food Mart, Inc., 386 F.2d 192 (1 Cir. 1967). Nor did the Company fail to give a pay raise which it had previously announced would be effective on a specific date. Compare NLRB v. Longhorn Transfer Service, Inc., 346 F.2d 1003 (5 Cir. 1965). Nor do we discern any other such indication that the withholding was other than a good faith effort to conform to the requirements of the law. There is here no such evidence of illegal motivation to justify overturning the Examiner's findings in this regard.

The order of the Board is modified by striking paragraphs 1(b) and 1(c) and 3. Enforcement of the order as thus modified is granted.