**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**M. H. BROWN COMPANY, Inc., Respondent.**

**No. 463, Docket 35350.**

United States Court of Appeals, Second Circuit.

Argued Feb. 17, 1971.

Decided May 3, 1971.

Allison W. Brown, Jr., Atty., N. L. R. B. (Arnold Ordman, Gen Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Arline Mendelson, Washington, D. C., Atty., of counsel), for petitioner.

George H. Foley, Hale & Dore, Boston, Mass., for respondent.

Before LUMBARD, Chief Judge, and SMITH and FEINBERG, Circuit Judges.

J. JOSEPH SMITH, Circuit Judge:

This is a petition of the National Labor Relations Board for enforcement of the Board's order requiring respondent, M. H. Brown Company to bargain with Mechanics Educational Society, AFL–CIO, to offer reinstatement and back pay to six discharged employees, and to cease and desist from various unfair labor practices. Enforcement of the order is denied.

The chronology of events from which the Board found unfair labor practices is as follows: On January 9, 1969, the union began organizing the plant. On January 10, the union sent a telegram to President Brown advising him of this organization drive. That afternoon, he called three successive groups of employees into his office and asked what their complaints and problems were. On January 14, the union organizer and an employee met with Brown and requested recognition, offering to show him authorization cards signed by a majority of the unit's employees. Brown said he did not have the authority to respond to these requests and would have to check with the parent company in Boston. He declined to inspect the cards.

The three employees who met with Brown took the rest of the afternoon off. The next morning, they received notices requiring that they state the reason for this absence. On January 17, the second shift with seven employees was discontinued. On January 20, the union again unsuccessfully sought recognition. On January 21, Brown filed with the Board a representation petition seeking an election under section 9(c) (1) (B) of the Act. On February 13, all full time employees were granted pay raises retroactive to January 3, and vacation and sick leave benefits were extended.

The trial examiner found that (1) the January 10 questioning was coercive interrogation in violation of section 8(a) (1) of the National Labor Relations Act; (2) Brown's promising and granting wage increases and fringe benefits was aimed at discouraging union activities in violation of section 8(a) (1); (3) requiring the three union men to state why they were absent violated section 8(a) (1); (4) eliminating the second shift and laying off seven employees violated sections 8(a) (3) and (1); and (5) refusing to bargain with the union violated sections 8(a) (5) and (1). The Board adopted these findings.

In at least two principal respects, which must have had major influence on the bargaining determination, the Board's findings are quite plainly wrong. In holding that the pay raise determination came after the union activity became apparent, not only was Brown disbelieved, but also the uncontradicted testimony of the people to whom he had revealed the plans at the Christmas party.[1] Likewise, the uncontradicted evidence of the business decline prior to the layoffs was ignored or misconstrued. The other findings are also lacking in substantial support.

Determination of credibility is, of course, for the examiner and the Board, but unless plain errors such as these are held to require correction the reviewing function of the courts is a mere pretense.

## I. JANUARY 10 INTERROGATIONS.

 There is no real dispute as to what happened at each of these three meetings. Brown told the employees that he was surprised to hear of the union campaign, and asked them what their complaints were. Almost all said money, and Brown replied he was going to give them raises as he had previously mentioned to several of them. Once or twice, he suggested a wage benefit package was in the offing which was better than what the employees were asking for, but that he didn't know if he could immediately put the increases into effect as he had planned because of the union's appearance. However, Brown did not ask which or how many employees joined the union. Several of the respondent's witnesses also testified that Brown stressed he was not asking them personally about their feelings toward the union.

The trial examiner found that this constituted coercive interrogation. This conclusion is not supported by the record. In NLRB v. Dorn's Transportation Co.,

405 F.2d 706 (2d Cir. 1969) this court held that an employer can interrogate employees with respect to union organization purely for informational purposes. There is nothing in the record to suggest any other motivation. This circuit has laid down several tests to attempt to determine whether coercion is implicit in the questioning: (1) background; (2) nature of information sought; (3) identity of questioner; (4) place and method; (5) truthfulness of reply (Bourne v. NLRB, 332 F.2d 47 (2d Cir. 1964). Here there was no history of hostility to unionism and Brown was not seeking information as to the union sentiments of individual employees. While the questioner was the president and the questioning took place in his office, this is a small company and no one disputes his assertion that there was no other satisfactory place to hold these meetings. Finally, the replies given by the employees were truthful.

The petitioner cites NLRB v. Milco, Inc., 388 F.2d 133 (2d Cir. 1968). But there, the questions found to be coercive were directed at each employee's own position and sympathies, and the replies were evasive. NLRB v. Consolidated Rendering Co., 386 F.2d 699 (2d Cir. 1967) is cited by the Board for the proposition that in a small plant workers are especially sensitive to their employer's anti-union attitude. Yet here the employees' replies were truthful. Finally, Bryant Chucking Grinder Co. v. NLRB, 389 F.2d 565 (2d Cir. 1967), cert. denied, 392 U.S. 908, 88 S.Ct. 2055, 20 L.Ed.2d 1366 (1968) is noted for the proposition that the promise of increased benefits further shows the unlawful nature of the questioning. But there the employees were interrogated by supervisory officials as to their union attitudes against a background of active employer opposition with no indication of the purpose of

---

1. Brown testified he told them after receiving the gift at the party December 20. Newman heard of the raise from two or three different employees after the Christmas party (App. 73).

Besides Newman, the following employees testified to learning of the plan for the raise either before the party, at the party or the day following the party: Jaquish (App. 222); Crisman (App. 225); Crim (App. 227); Hallock (App. 232); Pupera (App. 251); Bolen (App. 252); and Murphy (App. 254).

questioning, and no assurance against reprisals, none of which is true in the present case. The Board seizes on the opinion's statement that some of these interrogations were particularly threatening in that they were "in connection with interviews concerning eligibility for merit increases"—obviously, a different matter.

## II. WRITTEN NOTICE FROM THREE EMPLOYEES.

■ After the three members of the in-plant employees committee finished their January 14 meeting with President Brown, they took the rest of the afternoon off. The next morning, they received written notice requiring them to forward their excuse in writing. The Board contends that this violated section 8(a) (1).

Again, it is difficult to find support for this conclusion in the record. First, they had no business taking the rest of the day off. Second, no disciplinary action was ever taken against them. Third, although the trial examiner may have been justified in concluding that the company was generally very lenient in this regard, he is clearly in error in treating the company's response as an unprecedented departure from previous practices. The respondent's exhibits show that on several occasions, well before the union appeared on the scene, two of these three men had been warned in writing that they might be discharged because of tardiness and absences. Given this, it is mere quibbling to say that Brown never asked for a *response* in writing before.

The Board cites Colecraft Manufacturing Co. v. NLRB, 385 F.2d 998 (2d Cir. 1967). There, an employee was dismissed for absenteeism and tardiness on the same day the union made its bargaining demand. Prior to that time, there had never been any warnings, reprimands or discharges for these lapses. The court sustained the Board's finding of a section 8(a) (1) violation finding it constituted an abrupt change of policy designed to discourage union membership. These facts are far more extreme than in the present case.

## III. PROMISING AND GRANTING WAGE AND FRINGE BENEFITS.

■ Brown's promise of increased benefits of January 10 were fulfilled on February 13 and made retroactive to January 3. Simply put, the issue posed by the parties is whether the trial examiner was justified in disbelieving Brown's assertion that these raises were planned in December 1968 prior to the initiation of any union activity. If Brown really did plan the increases in December, to be instituted in January, then on January 10, it is not surprising that he would tell his men that this was so in answer to their complaints. The dilemma Brown found himself in, however, is that if he went ahead and gave the increases, the union would accuse him of committing an unfair labor practice as it in fact did. But if he withheld the increases, and they were already planned, that would also be an unfair labor practice if the requisite anti-union motivation was found. So he waited until his attorney indicated he could proceed with the raises in February, and then made the increases retroactive.

Although the trial examiner here resolved the conflicting testimony in petitioner's favor, he still had to acknowledge that Brown had spoken encouragingly of the coming year and many employees believed they could expect to get a raise. Furthermore, Brown testified as to a valid business purpose—a nearby company, Mohawk Data Science, was paying higher wages and thus threatening to siphon off his skilled workers. The fact that there was a competitor for labor in the same market paying higher wages is nowhere challenged. Furthermore, as the respondent points out, part-time workers were excluded from the pay increase; only the skilled workers received a raise. Moreover, each skilled worker received a different-sized increase. Yet, every worker had one vote on the union. The trial examiner disbelieved Brown's testimony as to the previously planned

increases. The record lacks support for such a finding. The examiner relied on the fact that Brown testified that he showed Bickman (the functional owner of the company) a list of proposed increases, although Bickman testified only that the two talked generally of wages. Bickman apparently wasn't asked, however, whether Brown showed him such a list. The trial examiner was also of the view that if such a large raise were planned, it would have been spelled out at the Christmas party where the increases had been discussed. But each employee got a different raise, and some none at all. The trial examiner also refused to believe the explanation that the respondent was awaiting legal advice before instituting the raises, yet there is no evidence to support such disbelief. The finding in effect that the increase was not previously planned is not supported by substantial evidence in the record taken as a whole.

## IV. LAYOFFS.

■ The crucial fact here is that there was no showing that the employer knew whether or how many of the second-shift men who were laid off belonged to the union. The Board's theory is that the January 16 layoffs were a show of force designed to discourage union activity. Decisions in this circuit have recognized the importance of timing in allowing an inference of discriminatory motivation. Thus, abrupt layoffs or those occurring around crucial dates in a union organizational campaign are especially suspect. (See, NLRB v. Montgomery Ward & Co., 242 F.2d 497 (2d Cir. 1957), cert. denied, 355 U.S. 829, 78 S.Ct. 40, 2 L.Ed.2d 41 (1957); NLRB v. Dorn's Transportation Co., 405 F.2d 706 (2d Cir. 1969); NLRB v. L. E. Farrell Co., 360 F.2d 205 (2d Cir. 1966)). In the present case, the layoffs occurred immediately after the union had claimed a majority. Our decisions have also recognized that it is not always necessary to show that the employer knew that those he laid off had signed union authorization cards. A "show of force" designed to discourage union activities is sufficient to violate section 8(a) (3). (Cf. Majestic Molded Products v. NLRB, 330 F.2d 603 (2d Cir. 1964); NLRB v. Piezo Manufacturing Corp., 290 F.2d 455 (2d Cir. 1961)). But where the employer asserts a business justification for the layoffs, some basis for concluding that they were motivated at least partially by anti-union considerations must be shown.

The company asserts that it discontinued the second shift because orders received by the company and the balance of orders on hand had declined dramatically. It is undisputed that the backlog of outstanding orders declined steadily from $183,500 in April 1968 to $27,700 by the end of the year. And in April 1969, despite the layoffs, the backlog had been reduced to a mere $4,200. As to the fact that more employees were hired after the layoffs, these were temporary employees, and the Board made no showing that the total number of employees ever reached the same level as before the layoffs. In the face of the established need for reduction in force at the time, the finding that the reduction was an anti-union "show of force" appears to us to lack substantial support in the record taken as a whole.

## V. ORDER TO BARGAIN.

Since, as indicated above, we have concluded that the record fails to support any substantial violations of section 8 (a) (1) or (a) (3) of the Act, a bargaining order is clearly not justified.[2] Enforcement denied.

2. Moreover, as Judge Friendly pointed out in his recent opinion for this court in NLRB v. General Stencils, 438 F.2d 894 (2d Cir. 1971), the Board itself in several post-*Gissel* cases refused to issue bargaining orders in circumstances evidencing much more flagrant anti-union practices than could be said to be present here even were we to uphold the Board on one or more of the findings.