UNPUBLISHED

# UNITED STATES COURT OF APPEALS

## FOR THE FOURTH CIRCUIT

SARA LEE BAKERY GROUP,
INCORPORATED, formerly known as
The Earthgrains Company,
            *Petitioner,*

v.                                                          No. 02-1115

NATIONAL LABOR RELATIONS BOARD,
            *Respondent.*

NATIONAL LABOR RELATIONS BOARD,
            *Petitioner,*

v.                                                          No. 02-1254

THE EARTHGRAINS COMPANY,
            *Respondent.*

On Petition for Review and Cross-Application
for Enforcement of an Order
of the National Labor Relations Board.
(11-CA-18295, 11-CA-18339)

Argued: December 3, 2002

Decided: February 21, 2003

Before WILKINSON and KING, Circuit Judges, and
Joseph R. GOODWIN, United States District Judge for the
Southern District of West Virginia, sitting by designation.

---

Petition for review denied and cross-application for enforcement
granted by unpublished per curiam opinion.

**COUNSEL**

**ARGUED:** Charles Preyer Roberts, III, CONSTANGY, BROOKS & SMITH, L.L.C., Winston-Salem, North Carolina, for Sara Lee. William M. Bernstein, Senior Attorney, NATIONAL LABOR RELATIONS BOARD, Washington, D.C., for Board. **ON BRIEF:** Arthur F. Rosenfeld, General Counsel, John E. Higgins, Jr., Deputy General Counsel, John H. Ferguson, Associate General Counsel, Aileen A. Armstrong, Deputy Associate General Counsel, Frederick C. Havard, Supervisory Attorney, NATIONAL LABOR RELATIONS BOARD, Washington, D.C., for Board.

---

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

---

**OPINION**

PER CURIAM:

There are two questions before the court: (1) whether there is substantial evidence to support a finding by the National Labor Relations Board (Board) that The Earthgrains Company (Earthgrains) unlawfully withheld a wage increase from employees scheduled to vote in a Board-conducted union representation election in violation of sections 8(a)(1) & (3) of the National Labor Relations Act (NLRA), 29 U.S.C. § 151 *et seq.* (2002); and (2) whether there is substantial evidence to support the Board's findings of other unfair labor practices by Earthgrains in violation of section 8(a)(1) of the NLRA. We hold that there is substantial evidence in the record to support the findings on both issues. Accordingly, we deny Earthgrains' petition for review and grant the Board's cross-application for enforcement.

I.

On August 19, 1998, Earthgrains[1] purchased the Palmetto Bakery

---

[1]Sara Lee Bakery Group, Inc., the named petitioner in this case, was created by the merger of its parent company, Sarah Lee, and Earthgrains. For simplicity, we will refer to the petitioner as "Earthgrains."

Company (Palmetto) in Orangeburg, South Carolina. On December 22, 1998, Earthgrains posted a notice advising its employees that it was raising the starting wage rate and progression for employees in their first year of employment. The notice also stated, "We are currently reviewing all job rates for a planned increase in the new fiscal year which begins in April. This adjustment will take into account increases in inflation as well as the recently announced increase in the insurance co-pay."[2] (J.A. 860).

In January of 1999, Earthgrains posted a notice containing the new wage rates, including the new wage rates for the maintenance department's category A, B, and C mechanics. Thereafter, Plant Manager David Maxwell met with maintenance employees to discuss those new rates. At that time, Maxwell advised the maintenance employees that Earthgrains only gave cost-of-living raises. On January 27, Maxwell posted a memorandum to all employees repeating the December statement: "We are currently reviewing all job rates for a planned increase in the new fiscal year which begins in April." (J.A. at 862).

In November of 1998, maintenance employee Dannie Dukes had contacted the International Brotherhood of Electrical Workers Local Union 776 (Union) regarding representation of Earthgrains' maintenance employees. On March 2, 1999, the Union wrote Earthgrains a letter stating that it represented a majority of Earthgrains' "Maintenance Mechanics." The letter requested that Earthgrains meet with the Union to confirm the Union's claim of majority and to schedule collective-bargaining negotiations. On March 8, the Union filed a petition with the Board for a representation election. By letter dated March 9, Earthgrains refused to recognize the Union. On March 16, however, the Union and Earthgrains entered into a "Stipulated Election Agreement" that provided for a secret-ballot election on April 21 by nineteen maintenance department employees.

On March 18, Earthgrains instructed maintenance supervisor Eric Antley to speak about the Union campaign to the employees under his supervision. Furnished with three pages of Earthgrains' written "talk-

---

[2]Prior to Earthgrains' acquisition of this facility, Palmetto historically had given wage increases in June. Palmetto gave its last wage increase on June 5, 1998.

ing points," Antley met with employees Charles Free, Johnnie Crider, Paul Jennings, Sheck Nettles, and Dannie Dukes on an individual basis. Antley advised each employee that Earthgrains' management did not believe that Union representation was in the best interest of the employees or of the company.

During the course of these conversations, Antley made many statements regarding Union representation and the effect that it would have on the maintenance employees. To Free, Antley stated that the maintenance employees "probably would lose everything that [they] already had with [Earthgrains] as far as 401(k) or benefit packages" if they selected the Union, and that they would not receive a raise on April 1 "because [they] were Union active and the Union may see that as a bribe." Antley warned Free that the employees "better not be caught talking Union on the job," and that "[t]he only place that [they] could talk about it would be in the canteen or out of [their] work place." (J.A. at 358-59). To Crider, Antley stated that if the employees chose Union representation, their insurance and pay would be "whatever the Union could get," but that he "could almost guarantee it wouldn't be what the rest of the bakery got." He added that he was "real disappointed in [Crider] personally for starting something like this." Crider had been openly displaying a Union "facts" book on his tool cart, and Antley told him that "it was illegal to have Union literature on the job," and that Crider must have his Union literature "out before . . . morning, before people start[ ] coming in on the day shift." He concluded by telling Crider that employees "couldn't talk about the Union during work hours, only during breaks." (J.A. at 321-25).

To Jennings, Antley stated that Earthgrains would not give the maintenance employees an April raise because it would be like "driving [the employees] to vote against the Union." Antley also told Jennings that the Union could do nothing for the employees with respect to benefits and that if the Union came in, Earthgrains would have to "go through the Union." (J.A. at 271-72). To Nettles, Antley stated that Earthgrains "didn't want a Union in the bakery, and anybody involved with the Union in part or whole would have no further advancement or increase in pay if they were in any way connected with the Union." (J.A. at 55-56). Antley went on to state that the bakery staff was going to receive an increase of seventy cents per hour, and that anyone involved in the Union would not receive this

increase. Finally, Antley stated to Dukes that the maintenance employees would not receive a raise on April 1 "[b]ecause the Union would file charges against the bakery for saying they were trying to bribe the employees . . . to not vote for the Union." Antley also told Dukes that the employees could lose their benefits and pay raise if the Union was voted in, but that "if the Union was voted out, then the raise would be given." (J.A. at 123).

A separate incident involving Dukes occurred with a different supervisor. Earthgrains' Sanitation Manager Gene Rodoski noticed that Dukes was wearing a Union hat and asked Dukes where he could get a Union jacket. Dukes replied that if Rodoski would sign up for the Union, he would make sure that Rodoski received a jacket. In response, Rodoski told Dukes that the handbook forbid employees from wearing advertisements other than those on the company uniform. The two men then parted with no further conversation.

On March 22 and 23, Maxwell met with each shift of the maintenance employees and discussed the wage increase issue. He read from a script, and after reviewing his prior discussions with employees concerning the ongoing review of a wage increase, Maxwell announced:

> We have now completed that review and will be giving plant employees a pay increase effective April 4, 1999. We are not able to give our maintenance department employees a pay increase at this time however.
>
> Because of the Union election scheduled for our maintenance employees for April 21, 1999, we cannot give those employees a pay increase because the Union could accuse [Earthgrains] of trying to buy votes and could file charges against the company with the Labor Board. This is why we cannot give you a pay increase at this time.
>
> Once the election is over, if the Union is defeated we can give you a pay increase just like our other employees here. If the Union is voted in, however, your pay is something that would have to be negotiated.

(J.A. 863-64). As promised, on April 4, all plant employees except the maintenance employees received a seventy cent per hour increase. At a meeting of all employees on April 13, Maxwell again stated that the maintenance employees would not receive the wage increase because of the impending April 21 election.

On April 16, Earthgrains' Senior Vice President Talmage Miles came to the Orangeburg facility and addressed the maintenance employees. Among other things, Miles told the employees that "there were no promises period," and that if the Union was voted in, "everything [would be] negotiable from that point." (J.A. at 490). On April 21, the election was held, and the maintenance employees voted against Union representation by a margin of 16 to 2. Following the April 21 election loss, the Union filed objections to the election and an unfair labor practices complaint with the Board.[3] After this filing, the Board's General Counsel issued a consolidated complaint alleging that Earthgrains had violated sections 8(a)(1), (3), & (5) of the NLRA. A hearing was held before Administrative Law Judge George Carson, II (ALJ) in September of 1999. On December 1, 1999, the ALJ issued a proposed order recommending that the Board find that Earthgrains committed unfair labor practices by: (1) coercively interrogating employees; (2) imposing a gag rule prohibiting Union discussions; (3) forbidding possession of Union literature; (4) advising employees that wearing Union insignia violated plant rules; (5) threatening employees with loss of benefits and less favorable working conditions because of their Union sympathies; (6) advising employees that the wage increase was being withheld from them because of their Union activities; (7) promising a wage increase if the Union was voted out; and (8) withholding a wage increase from the employees in the collective bargaining unit because of those employees' Union activity. Earthgrains filed exceptions to the ALJ's proposed order, and on December 3, 2001, the Board issued a decision adopting the ALJ's recommendations in all material respects. The Board's order (1) required Earthgrains to cease and desist from unfair labor practices violating employees' rights under section 7 of the NLRA; (2) directed

---

[3]On May 5, Antley told the maintenance employees that objections to the election had been filed and that they would not receive their raise "until this issue was settled." However, the maintenance employees did receive the seventy cent per hour increase, effective June 6.

Earthgrains to make its maintenance employees whole for the loss of earnings and benefits; and (3) ordered Earthgrains to post copies of a remedial notice.[4] On January 2, 2002, Earthgrains filed a petition for review with this court, and the Board filed a cross-application for enforcement on March 4, 2002.

## II.

The findings of the Board as to questions of fact are conclusive if supported by substantial evidence on the record when considered as a whole. 29 U.S.C. § 160(e) (2002); *NLRB v. CWI of Maryland, Inc.*, 127 F.3d 319, 330 (4th Cir. 1997). Determining whether substantial evidence exists requires an "objective assessment of the sufficiency of the evidence." *Dorsey Trailers, Inc. v. NLRB*, 233 F.3d 831, 840 (4th Cir. 2000). "Substantial evidence is 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Pirelli Cable Corp. v. NLRB*, 141 F.3d 503, 514 (4th Cir. 1998) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). Furthermore, "[s]ubstantial evidence is more than a scintilla, but less than a preponderance." *Id.* (internal quotations omitted). If faced with two conflicting views, we must defer to the Board's determination rather than substitute our own assessment. *Weis Mkts., Inc. v. NLRB*, 265 F.3d 239, 243 (4th Cir. 2001). Accordingly, we must affirm the Board's construction of the NLRA if that interpretation is "reasonably defensible." *Ford Motor Co. v. NLRB*, 441 U.S. 488, 497 (1979).

## III.

Section 7 of the NLRA guarantees that

> [e]mployees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to

---

[4]The Board's ruling also sustained seven of the Union's objections regarding the election itself, and ordered that the April 21 election be set aside and that a new election be conducted. A Board order directing a second election is not a final order under 29 U.S.C. § 160(f), and therefore is not directly reviewable by this court. *Firestone Synthetic Fibers Co. v. NLRB*, 374 F.2d 211, 213 n.3 (4th Cir. 1967).

engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection . . . .

29 U.S.C. § 157 (2002). Section 8 of the NLRA states in pertinent part that

[i]t shall be an unfair labor practice for an employer (1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 7 . . . (3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization . . . .

29 U.S.C. §§ 158(a)(1) & (3) (2002). Earthgrains raises two issues in this petition for review. First, Earthgrains contends that the Board incorrectly concluded that it unlawfully withheld a wage increase from its maintenance employees in violation of sections 8(a)(1) & (3). Second, Earthgrains argues that the Board's findings of additional, independent unfair labor practices under section 8(a)(1) are not supported by sufficient evidence. We will address each argument in turn.

## A. *WAGE INCREASE WITHHOLDING*

Earthgrains contends that the Board erred in determining that its failure to grant the April wage increase to the employees involved in the Union election was an unfair labor practice. Earthrains argues that it was compelled to withhold the increase for fear of violating the NLRA. In determining whether an employer may grant or withhold a wage increase prior to a union election, the Board has explained that an employer must maintain the status quo. According to the Board,

[a]n employer's legal duty in deciding whether to grant benefits while a representation case is pending is to determine that question precisely as he would if a union were not in the picture. If the employer would have granted the benefits because of economic circumstances unrelated to union organization, the grant of those benefits will not violate the Act. On the other hand, if the employer's course is altered by virtue of the union's presence, then the employer has violated the Act . . . .

*McCormick Longmeadow Stone Co., Inc.*, 158 N.L.R.B. 1237, 1242 (1966). Thus, an employer has a duty during the election process not to "change the status quo if the change may reasonably affect the outcome of the pending election." *ATC/Vancom of California, L.P.*, No. 31-CA-24875, 2001 N.L.R.B. LEXIS 1003, at \*\*11-12 (Dec. 14, 2001). This court specifically addressed the status quo standard in *Southern Maryland Hosp. Center v. NLRB*, 801 F.2d 666 (4th Cir. 1986). In that case, we articulated a two-part analysis for employers evaluating whether to withhold a wage increase:

> The initial determination . . . is whether an employer by promises or by a continuous course of conduct has made a particular benefit part of its "established practice." The focus in such a situation should be upon the employer, who is confronted with the dilemma of deciding whether his past promises or grants of benefits have created a clear *status quo* that he must maintain during the pre-election period. The standard then is whether it would be clearly apparent to an objectively reasonable employer that his grant or denial of a benefit, at the time the action is taken, conforms to the *status quo*.

*Id.* at 669 (emphasis in original) (internal citations omitted).

Under *Southern Maryland*'s test, the first step is to determine whether the proposed wage increase has become part of an "established practice." *Id.* While it is true that Earthgrains had only recently acquired Palmetto and therefore had no past history at the Orangeburg facility, the *Southern Maryland* test does not require a lengthy employer history. Under *Southern Maryland*, a particular benefit can become part of an "established practice" simply by promises. *Id.* In this case, repeated statements by Earthgrains' management regarding a "planned increase in the new fiscal year which begins in April" would certainly constitute promises of a raise to listening employees. Accordingly, we find that the proposed wage increase was sufficiently promised to become part of the "established practice."

The second step of the *Southern Maryland* test requires determining "whether it would be clearly apparent to an objectively reasonable employer that his grant or denial of a benefit, at the time the action

is taken, conforms to the *status quo*." *Id*. Given Earthgrains' repeated promises of an upcoming wage increase in April, it should have been apparent to Earthgrains that granting the wage increase to *all* of its employees, whether part of the Union drive or not, would have been in conformance with the status quo. Earthgrains' withholding of the wage increase was therefore unreasonable and a violation of the NLRA.

Even if the wage increase had *not* become part of the status quo, Earthgrains still violated the NLRA because the withholding was motivated by anti-union sentiment. *Id*. ("[W]hen there is no established practice of granting benefits, the General Counsel must show that the employers' withholding of particular benefits was motivated by anti-union sentiment to prove a violation of the Act." (internal quotations omitted)). The record reflects that anti-union animus directly motivated Earthgrains' statements and actions. By public announcement, Earthgrains advised its maintenance employees that the Union was the cause of the wage withholding.[5] Management clearly attempted to manipulate employee opinion against the Union, and the evidence of this anti-union sentiment is sufficient to support the Board's ruling.

---

[5]In *NLRB v. Dorn's Transportation Co.*, 405 F.2d 706 (2d Cir. 1969), the Second Circuit, in finding no NLRA violation in a wage withholding case, stated that it was "not a situation where the employer has by public announcement specifically advised the employees that the union is causing them to lose a wage increase they would otherwise have received." *Id*. at 715. In this case, Plant Manager Maxwell did just that:

> Because of the Union election scheduled for our maintenance employees for April 21, 1999, we cannot give those employees a pay increase because the Union could accuse [Earthgrains] of trying to buy votes and could file charges against the company with the Labor Board. This is why we cannot give you a pay increase at this time.

> Once the election is over, if the Union is defeated we can give you a pay increase just like our other employees here. If the Union is voted in, however, your pay is something that would have to be negotiated.

(J.A. 863-64).

### B. *MISCELLANEOUS UNLAWFUL THREATS AND INTERROGATIONS*

The right of employees to form and join unions is guaranteed by section 7 of the NLRA. Section 8(a)(1) of the NLRA protects that right by making it an unfair labor practice for an employer "to interfere with, restrain, or coerce employees" in the exercise of their section 7 rights. 29 U.S.C. § 158(a)(1) (2002). When analyzing whether an employer's statements or actions are coercive under the NLRA, it is important to note that this factual question is one best answered by the Board's special expertise. *See J.P. Stevens & Co., Inc. v. NLRB*, 638 F.2d 676, 687 (4th Cir. 1980) ("The coercive effect of an employer's speech in a particular labor relations setting, 'is a question essentially for the specialized experience of the NLRB.'" (quoting *Daniel Constr. Co. v. NLRB*, 341 F.2d 805, 811 (4th Cir. 1965))). The Board, in making this decision, considers whether "the conduct in question had a reasonable tendency in the totality of the circumstances to intimidate." *Standard-Coosa-Thatcher Carpet Yarn Div., Inc. v. NLRB*, 691 F.2d 1133, 1137 (4th Cir. 1982) (internal quotations omitted). In the instant case, the Board found that Earthgrains engaged in a series of section 8(a)(1) violations in response to its maintenance employees' Union organization efforts.

### 1. *Coercive Interrogations*

While questioning employees about union sentiments is not *per se* unlawful activity, an employer may not interrogate its employees in a coercive fashion. *NLRB v. Nueva Eng'g, Inc.*, 761 F.2d 961, 965 (4th Cir. 1985). Several factors go into the Board's evaluation of coercion: "the history of employer hostility to the union, the nature of the information sought, the identity of the questioner, and the place and method of the questioning." *Id.* at 966. In determining whether there was intimidation, the Board must also "'take into account the economic dependence of the employees on their employers, and the necessary tendency of the former, because of that relationship, to pick up intended implications of the latter that might be more readily dismissed by a more disinterested ear.'" *Id.* at 965 (quoting *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 617 (1969)). Here, the conditions of Antley's individual interrogations of maintenance employees made such employer hostility to the Union plain. He took the workers late

at night and one by one to his office for what were clearly coercive conversations or lectures.[6]

## 2.   *Gag Rule and Prohibition of Union Paraphernalia*

Soliciting support for a union and distributing union literature are two essential activities protected by the NLRA. *Consol. Diesel Co. v. NLRB*, 263 F.3d 345, 352 (4th Cir. 2001). Furthermore, "the workplace is 'uniquely appropriate' for such activities, so long as the activities are conducted in nonwork areas during nonwork time and in a non-abusive manner." *Id.* at 352 (quoting *Republic Aviation Corp. v. NLRB*, 324 U.S. 793, 801 n.6 (1945) (internal citations omitted)). Thus, no-solicitation and no-distribution rules can be valid in the workplace, provided that they are not selectively applied against pro-union activity and do not spring up only when union activities begin. *Opryland Hotel*, 323 N.L.R.B. 723, 728-29 (1997).

In this case, while the existing Earthgrains policy regarding no-solicitation and no-distribution was lawful, Antley went beyond that policy by imposing a gag rule and prohibiting Union literature.[7] Rather than simply stopping solicitation attempts or requesting the employees not to pass out Union fliers, Antley ordered the maintenance employees not to speak about the Union at all while at work. Antley also told Crider that it was illegal even to possess Union literature on the job. There is no evidence that Earthgrains previously restricted its employees' conversation topics in such a fashion. Accordingly, we find sufficient evidence to support the Board's finding on this section 8(a)(1) violation.

---

[6]The Board has declared a supervisor's office a "locus of authority," and the fact that questioning occurs there enhances the coercive effect of an interrogation. *Double D Constr. Group, Inc.*, No. 12-CA-21951, 2002 N.L.R.B. LEXIS 414, at *25 (Sept. 10, 2002).

[7]The fact that Antley misstated Earthgrains' lawful policy is of no consequence. We find no merit in Earthgrains' contention that Antley was merely a low-level manager with little authority. Accordingly, Earthgrains cannot be excused by Antley's incorrect interpretation of the policy.

The Board also found a violation of section 8(a)(1) in Rodoski's statement to Dukes that he could not wear a hat with a Union insignia on it. A rule restricting any personal display of union insignia on the job is presumptively unlawful. *Republic Aviation*, 324 U.S. at 803. The rule, however, is not absolute. "Rather, the right to wear union insignia can be abridged when the employer demonstrates that special circumstances exist which justifies [sic] the banning of union insignia." *E. Omni Constructors, Inc. v. NLRB*, 170 F.3d 418, 424 (4th Cir. 1999). "[S]ubstantial evidence of special circumstances, such as interference with production or safety, is required before an employer may prohibit the wearing of union insignia, and the burden of establishing those circumstances rest [sic] upon the employer." *Gov't Employees*, 278 N.L.R.B. 378, 385 (1986) (internal citations omitted).

The Board found that Earthgrains did not prove any special circumstances that would overcome the presumption that prohibiting union insignia is unlawful. Earthgrains argues that Rodoski's statement was innocuous because Dukes continued to wear his hat after the encounter. However, a showing of actual coercion is not required. If "the conduct in question had a reasonable tendency in the totality of the circumstances to intimidate," this is sufficient. *Corrie Corp. of Charleston v. NLRB*, 375 F.2d 149, 153 (4th Cir. 1967). Rodoski's statement implied that Dukes would suffer adverse consequences if he did not remove the Union insignia. Morever, the record reflects that Earthgrains consistently allowed bakery members to wear paraphernalia advertising vendors, and no manager had previously told Dukes that he could not wear a hat with advertising. These facts are sufficient to support the Board's finding of a violation in this instance.

### 3. *Threats of Loss of Benefits and Unfavorable Working Conditions*

It is a general rule that employers violate the NLRA if they threaten their employees with reprisal because of the employees' union activity. *Equitable Gas Co. v. NLRB*, 966 F.2d 861, 866 (4th Cir. 1992). An employer also violates the NLRA if it promises its employees benefits if they reject a union. *NLRB v. Gen. Wood Preserving Co.*, 905 F.2d 803, 808 (4th Cir. 1990). The Board found that Antley threatened employees Free, Crider, Jennings, Nettles, and Dukes in the course of discussing Earthgrains' "talking points." In addition, the

Board found that Plant Manager Maxwell threatened employees with the loss of the April pay raise and a loss of benefits if the Union was voted in, and promised a pay increase if the Union was voted out. Finally, the Board found Vice President Miles made unlawful threats of a loss of benefits.

There is substantial evidence to support the Board's findings as to Antley in his words alone. Antley told Free that the employees "probably would lose everything that [they] already had with [Earthgrains] as far as 401(k) or benefit packages" (J.A at 358) and told Dukes that "if the Union was voted out, then the raise would be given." (J.A. at 123). To Nettles, Antley stated that Earthgrains "didn't want a Union in the bakery, and anybody involved with the Union in part or whole would have no further advancement or increase in pay if they were in any way connected with the Union." (J.A. at 55-56). We affirm the Board's findings as to Antley.

The statements of Maxwell that the Board found objectionable were all related to the postponement of the April raise. While an employer is allowed to state that it will withhold a wage increase pending an election, the employer must also concurrently state that (1) the benefit will be granted after the election, regardless of the results, (2) that the sole purpose of the postponement is to avoid the appearance of influencing the outcome, and (3) that the burden for the postponement is not on the union. *Atl. Forest Prods.*, 282 N.L.R.B. 855, 858 (1987). Maxwell's statements on March 22 and 23 fail this test. Rather than assuring the maintenance employees that their pay raise would be granted regardless of the election's result, Maxwell stated that "[i]f the Union is defeated we can give you a pay increase just like our other employees here. If the Union is voted in . . . your pay is something that would have to be negotiated." (J.A. at 864). The additional statement that "the Union could accuse [Earthgrains] of trying to buy votes and could file charges against [Earthgrains]" does nothing more than place the blame for the postponement on the Union. We find sufficient evidence that those statements were threats in violation of the NLRA.

The Board's findings as to Vice President Miles' statements are also supported by substantial evidence. An employer's statement that it will "bargain from scratch" constitutes an impermissible threat if,

in the totality of the circumstances, the statement is likely to be understood by employees as an indication of the employer's hostile bargaining stance toward a union. *See, e.g., NLRB v. Aerovox Corp.*, 435 F.2d 1208, 1211-12 (4th Cir. 1970) (finding that, taken in context, the phrase "bargaining starts from scratch" was coercive). Under the circumstances of this case, Miles' statements that "there were no promises period" and "that everything is negotiable from that point" were coercive. We find substantial evidence to support the Board's finding that Miles' statements were also unlawful threats.

Accordingly, Earthgrains' petition for review is denied, and the Board's cross-application for enforcement is granted.

*PETITION FOR REVIEW DENIED; CROSS-APPLICATION FOR ENFORCEMENT GRANTED*