**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**WKRG–TV, INC., Respondent.**

**No. 71–3168.**

United States Court of Appeals, Fifth Circuit.

Jan. 2, 1973.

Marcel Mallet-Prevost, Asst. General Counsel, N. L. R. B., Washington, D. C., Charles M. Paschal, Jr., Director, Region 15, N. L. R. B., New Orleans, La., Lawrence Levien, Washington, D. C., for petitioner.

Willis C. Darby, Jr., Mobile, Ala., for respondent.

Before COLEMAN, GOLDBERG and GODBOLD, Circuit Judges.

GOLDBERG, Circuit Judge:

In this case we are once again faced with the difficult task of determining the propriety of a bargaining order when a union loses a representation election only after the employer's alleged unfair labor practices dissipate the card majority claimed by the union. Although the Supreme Court clarified many of the problems arising in this particular area of labor law in N.L.R.B. v. Gissel Packing Co., Inc., 1969, 395 U. S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547, the great number of cases since *Gissel* illustrate the many gray areas that were left to be decided. *See generally*, Platt, The Supreme Court Looks at Bargaining Orders Based on Authorization Cards, 4 Ga.L.Rev. 779 (1970); Christensen and Christensen, Gissel Packing and "Good Faith Doubt": the Gestalt of Required Recognition of Unions Under the NLRA, 37 U.Chi.L.Rev. 411 (1970).

The basic facts here are similar to those in many of *Gissel's* progeny and as in many of these cases there were a number of close factual questions for the Board to decide. WKRG is a television broadcasting station in Mobile, Alabama. In October, 1969, employee Formby, a newsman at the station wrote to the American Federation of Television and Radio Artists [AFTRA] for information on how to establish a chapter in Mobile. After Formby himself signed an authorization card on October 26, AFTRA, using a list supplied by Formby, mailed authorization cards to the other members of the unit. After an active campaign spearheaded primarily by Formby, authorization cards were obtained from 21 of the other 33 employees in the unit. Most of the cards were signed between November 10th and 13th with the remainder signed after a union meeting held on November 19th. On November 15th, WKRG President Kenneth Giddens addressed the employees at a meeting initially requested by Formby. In his address, Giddens ex-

pressed opposition to the union and made several promises for improved wages and benefits. Some of these promises were implemented prior to the holding of the election. On November 21 the union sent a letter to the company requesting recognition and on the same day filed a petition for a representation election with the N.L.R.B. The company received the union's letter on November 24th and on the same day Giddens issued a memorandum announcing additional implementation of benefits promised in the November 15th speech. The company never responded to the union's demand for recognition.

The Board's regional director determined the appropriate representational unit and directed that an election be held for that unit on February 12, 1970. The election results were 16 for the union, 17 against, and 1 vote was challenged.

Unfair labor practice charges were filed by the union on December 1, 1969, and again after the election on February 24, 1970. The union sought a Board ruling that the company had violated § 8(a)(1) of the NLRA[1] because of the anti-union activities prior to the election, and further, that based on the *Gissel* decision, the company had violated § 8(a)(5) of the NLRA[2] by failing to bargain with the union. The Board's complaint issued on June 5, 1970. A hearing was held in July and August of 1970 and the trial examiner's decision was rendered on November 18, 1970. The examiner found that the company had committed 8(a)(1) violations, but because he found that several of the authorization cards had been solicited by supervisors, the examiner rejected the 8(a)(5) charge.

The Board, in an order dated April, 1971, adopted the trial examiner's findings as to the 8(a)(1) violations but found contrary to the trial examiner on the 8(a)(5) issue. Specifically, the Board found that (1) the employer, WKRG–TV, committed § 8(a)(1) violations during the union's organizational campaign; (2) the unit determination made by the regional director was appropriate; (3) the union had received a valid card majority; and (4) a bargaining order was the most appropriate remedy in this case.[3] The company brings this appeal challenging the Board on all four of these findings. We will deal with each finding separately.

## I.  THE § 8(a)(1) VIOLATIONS

Between the time when the organizational campaign got underway and the election, the company committed various acts which were found by the Board to constitute violations of § 8(a)(1). Section 8(a)(1) forbids an employer from interfering with, restraining or coercing employees in the exercise of their section 7 rights. One of the fundamental rights guaranteed in section 7 is the right of self-organization. In order to protect this important right the Board and the courts have consistently taken a dim view of management activity calculated to undermine the union's attempt to achieve an electoral majority. Absent scrutiny by the Board and the courts, management can use its inherently powerful position over employees in many different ways to prevent employees from exercising their guaranteed right to choose freely collective representation. In this case the record indicates that WKRG utilized various methods of subtle coercion that both the trial examiner

1.  § 8(a)(1) reads:
   "8(a) It shall be an unfair labor practice for an employer—
   (1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 7. . ."

2.  § 8(a)(5) reads:
   "8(a) It shall be an unfair labor practice for an employer—
   (5) to refuse to bargain collectively with the representatives of his employees, subject to the provisions of section 9(a)."

3.  The Board's decision is reported at 190 NLRB No. 74.

and the Board found violative of § 8(a)(1). The company denies any use of pressure and contends that the union lost the election solely because a majority of the unit did not desire representation. We will review each of the actions found by the Board to constitute violations of § 8(a)(1).

■ A. *Promise of Benefits.* The most formidable violations in terms of undermining the union's organizational drive were the somewhat spontaneous grants of benefits by the company after the organizational drive began around November 10 and before the election was held on February 12. On November 15, Giddens, the company President addressed the employees. In his speech, he said, *inter alia*:

> "I am disturbed about organizing a Union among us. I hope it will not come about. . . . We just do not need to bring in outsiders to protect each other. We have taken care of our people. . . . We have already discussed adjustments in salaries. We are going to have a personnel officer who will make agreements which the Company will honor. We will evaluate jobs and see that our salary structure comes in line with similar positions in comparable markets. We will also institute some kind of insurance plan in addition to Blue Cross that we have now."

The company implemented these promises almost immediately. On November 20th, all employee fringe benefits were equalized; during December the company raised wages of 25 of the 34 employees in the unit; and during the three days immediately preceding the election, the company issued various memoranda to employees reciting the benefits the company had given to its employees and the benefits that would be given in the future. In addition, on November 24th and 25th, Alspaugh, a newly hired personnel consultant, solicited the employees' attitudes about their jobs.

On the face of it, this sort of "campaigning with benefits" fits squarely within the type of conduct proscribed by the Supreme Court's decision in N.L.R. B. v. Exchange Parts Co., 1964, 375 U.S. 405, 84 S.Ct. 457, 11 L.Ed.2d 435. In that case, as in this, in the face of a union organizational drive, the employer announced several new benefits prior to the representation election. A unanimous Court, speaking through Justice Harlan found such activity to be violative of § 8(a)(1). The Court reasoned:

> "The danger inherent in well-timed increases in benefits is the suggestion of a fist inside the velvet glove. Employees are not likely to miss the inference that the source of benefits now conferred is also the source from which future benefits must flow and which may dry up if it is not obliged."

375 U.S. at 409, 84 S.Ct. at 460, 11 L. Ed.2d at 439.

The company responds, however, by saying that the *Exchange Parts* proscription applies only when the new benefits are granted with the clear intention of undermining the union campaign. In a rather intricate factual argument, the company attempts to paint a picture portraying President Giddens as intending to increase the benefits well in advance of the time the union began organizing and showing that delay was caused only by a breakdown in communications during Giddens' temporary absence from the company. The company insists that when Giddens spoke to the employees on November 15th at Formby's request, he did not know that an organizational drive was underway. The anti-union references in his speech were said to refer to the IBEW, which had previously been involved in representational disputes with various WKRG employees, and were not aimed at the AFTRA organizational drive.

In essence, the company argues that it cannot be faulted for granting benefits to its employees when such benefits were not motivated by an anti-union ani-

mus. We are in full agreement with the company. Certainly any rule that would prevent the granting of employee benefits in the absence of an anti-union effect, either intended or foreseeable, would go too far and it is not impossible to envision a factual situation where a grant of benefits during a campaign would be permissible. *E. g.*, N.L.R.B. v. M. H. Brown Co., 2 Cir. 1971, 441 F.2d 839, 842–843; Wilkinson Mfg. Co. v. N. L.R.B., 8 Cir. 1972, 456 F.2d 298, 303. But this is not such a case.

The trial examiner, whose findings on the 8(a)(1) violation were accepted by the Board, held a full factual hearing at which the company raised this defense. The examiner, after considering these objections, concluded, "I find and conclude that these benefits were announced and granted with a purpose to influence the election and they reasonably tended so to influence it." The Board accepted these findings and we cannot say they are unsupported by the record. *See* N. L.R.B. v. Southwire Co., 5 Cir. 1970, 429 F.2d 1050, 1056–1057. In arguing that the company intended to grant the benefits all along, the company is met head on by the simple fact that the benefits were not granted until the organizational drive had actually materialized and presented a substantial threat of success.

■ A company may in its employee relations be sincerely noblesse oblige, but its nobility of purpose and spirit must not be anti-union motivated. The union is not put to proving the absolute of anti-unionism, but the examiner and Board are free to engage the ecological atmosphere of 8(a)(1) violations. The examiner and Board have every right to conclude that the manna dropping from heaven were based upon fear that sustenance would flow from unionization. We cannot ignore decisional acceleration in employee benefits preceded by months of lethargy. Lightning struck only after the union's rod was hoisted. In this case the wage readjustments and other benefits, to say nothing of the initial announcement of these benefits, were clearly a counterweight to AFTRA's organizational efforts. To permit a company to time its announcement and allocation of benefits in such a fashion would be a great disservice to the ideal of organizational freedom so deeply imbedded in the N.L.R.A.

Being bound by the Board's supportable factual determination that the promise and granting of benefits were consciously related to the union's organizational effort, we are in full agreement with the Board that such behavior constitutes a clear violation of § 8(a)(1).

■ B. *No Solicitation Rule.* During the organizational campaign Formby held several meetings at the T. V. station during company time. In response to this, on November 21, the company informed Formby and another employee, Fraggard, that *any* solicitation on company time and on company property was forbidden. On December 16th Formby received a formal letter of reprimand from the company for continuing his solicitations for the union in violation of the new rule. The examiner found the rule to be discriminatory against the union. The Board found the no-solicitation rule informally promulgated to Formby and Fraggard to be overly broad and chose to invalidate it on that ground. Both found the rule violative of § 8(a)(1).

■ While it is clear that an employer maintains the right to regulate solicitation on company property, it must be done with a legitimate purpose in mind and may not be discriminatory in either purpose or foreseeable effect. *See* Republic Aviation Corp. v. N.L.R.B., 1945, 324 U.S. 793, 65 S.Ct. 982, 89 L.Ed. 1372. The blanket rule that was announced to Formby and Fraggard went well beyond what was necessary to maintain appropriate discipline and decorum at the station.

■ Section 8(a)(1) demands that we carefully scrutinize no-solicitation rules promulgated in the temporal context of an organizational drive in order to prevent unnecessary or calculated em-

ployer inhibition of union advocacy. *See, e. g.,* N.L.R.B. v. Beverage-Air Co., 4 Cir. 1968, 402 F.2d 411. The reprimand received by Formby for his advocacy was mild, but it demonstrates the potential for employer abuse inherent in a no-solicitation rule of uncertain dimensions. *See* Campbell Soup Co. v. N.L.R.B., 5 Cir. 1967, 380 F.2d 372. *See generally,* Derishinsky, The Solicitation and Distribution Rules of the N.L.R.B., 40 U.Cin.L.Rev. 417 (1971).

The rule in this case could easily have been interpreted as applying to both working and non-working hours, and we are unable to detect the special justification that is necessary to uphold a no-solicitation rule which applies to non-working hours. *See, e. g.,* Republic Aviation Corp. v. N.L.R.B., *supra,* 324 U.S. at 803–805, 65 S.Ct. 982, 89 L.Ed. 1372; N.L.R.B. v. Varo, Inc., 5 Cir. 1970, 425 F.2d 293, 297. The clearly foreseeable effect of the broad, ambiguous rule established by the company here is the inhibition of organizational efforts by the union advocates. As we held in N.L.R.B. v. Walton Mfg. Co., 5 Cir. 1961, 289 F.2d 177, 180, when passing on the validity of a no-solicitation rule, "Whether respondent infringed upon its employees' freedom to engage in union or concerted activity guaranteed by Section 7 of the Act depends upon the reasonably foreseeable effects of its conduct upon its employees." The reasonably foreseeable effect of WKRG's ad hoc rule is quite clearly the inhibition of organizational activities. Without passing on the examiner's finding that the rule was discriminatory, we find, as did the Board, that the no solicitation rule at issue here was unduly broad and ambiguous and therefore violative of § 8(a)(1).

C. *Coercive Interrogation.* In mid November, while the campaign effort was in full swing, Formby was interro-gated by Haug, WKRG's operations manager, regarding his feelings about the union. The trial examiner and the Board both found that this interrogation violated § 8(a)(1).

The established rules regarding the permissibility of managerial questioning such as that which took place here concentrate on whether the questioning could reasonably be expected to induce fear of reprisal in the mind of the employee. *See* N.L.R.B. v. O. A. Fuller Supermarkets, Inc., 5 Cir. 1967, 374 F.2d 197, 203. If the questioning was not conducted in a manner or context reasonably productive of such fear, it will not be deemed an unfair labor practice, even if the questioning of the employee involved the union. *See, e. g.,* N.L.R.B. v. Mississippi Products, 5 Cir. 1954, 213 F.2d 670, 673; *see also* N.L.R.B. v. Varo, Inc, *supra*; Struksnes Const. Co., 165 N.L.R.B. No. 102 (1967).

In assessing the context within which the questioning took place in this case, we must consider the following: (1) Formby's position as leader of the organizational campaign; (2) the anti-union position taken by the company;[4] (3) the other § 8(a)(1) violations committed by the company which tend to accentuate the intimidatory context; and (4) the later reprimands in fact received by Formby. With these facts clearly in the record, we cannot reverse the Board's finding that Haug's questioning of Formby, admittedly non-coercive on its face, was coercive when viewed in the broader context. The interrogation of Formby was a violation of § 8(a)(1).

D. *Solicitation of Grievances—The Survey of the Personnel Consultant.* President Giddens in his November 15, 1969, speech promised that the company would "evaluate jobs and see that salary structures come in line with similar positions in comparable markets." On November 24, 1969 (the day the company

---

4. There is some dispute, as yet unresolved, as to whether the interrogation took place on November 13 or November 20. Although Giddens' speech did not take place until November 15, the record amply sup-ports the conclusion that Formby was aware of the company's anti-union posture regardless of the precise date of the questioning.

received the union's request for recognition), President Giddens in a memorandum to all employees announced that a wage consultant [Mr. Alspaugh] had been hired and was to do the following:

"Mr. Alspaugh is reviewing each job and is comparing the wages and personnel practices at WKRG-TV with other stations located in comparable markets. Mr. Alspaugh will make his findings and recommendations directly to the Board of Directors. If inequities exist, and I am sure they do, they will be corrected."

Alspaugh distributed his survey on November 24, 1969, accompanied by a memorandum which said, *inter alia:*

"This job content survey is being made to gather information vital to the establishment of salary rates that are properly aligned within the organization, and that are also competitive in the area and the industry."

The company contends the questionnaire "contains nothing that tends to interfere with, restrains or coerce employees in any way." While it is true that a questionnaire promulgated purely for informational purposes is not violative of the N.L.R.A., *see, e. g.,* N.L.R.B. v. M. H. Brown Co., Inc., *supra,* 441 F.2d at 841, in determining whether the questionnaire was in fact used for "informational purposes" and not as an instrument to defeat the union, again there is a need to look at the context within which the questionnaire was distributed. On the record, taking into account the contemporaneous union campaign, the other granted benefits, and the anti-union posture of the company, we are unable to say that the trial examiner erred when he concluded, "these questions, oral and in writing, constituted a sequel to Giddens' promises: the objective was here to discourage union activities and to defeat the organizing

efforts." The Board implicitly accepted this finding and we agree that it is fully supported by the record. We therefore find that the interviews and questionnaires constituted unlawful interference in violation of § 8(a)(1).

## II.  THE § 8(a)(5) VIOLATION

In order for the Board to find that WKRG had an obligation to bargain with the union, it was first necessary to find that (1) the unit was appropriate; (2) the union had achieved a valid card majority; and (3) a bargaining order was the most appropriate means of remedying the unfair labor practices while at the same time preserving employee free choice. We must deal with each of these findings.

A. *Appropriateness of the Unit.* Before a bargaining order is issued, it should be determined that the unit that the union is seeking to represent contains a sufficient commonality of interest to be deemed "appropriate" within the meaning of the N.L.R.A.[5] The Regional Director in his decision after the Representation Hearing found the following unit to be appropriate:

All full-time and regular part-time directors, photographers, film department employees, newsmen, announcers, artists, production crew, television promotion employee, art and set design employees employed at Employer's Mobile, Alabama, radio and television station: excluding engineers, salesmen, janitorial employees, the delivery employee, traffic employees, guards and supervisors as defined in the Act.

In his decision the trial examiner affirmed the Regional Director's finding of the appropriate unit. The Board in its decision did not consider this question.

5. Section 9(b) of the Act provides:
"The Board shall decide in each case whether, in order to assure to employees the fullest freedom in exercising the rights guaranteed by this Act, the unit appropriate for the purposes of collective bargaining shall be the employer unit, craft unit, plant unit, or subdivision thereof. . . ."

The Regional Director stated that "the record shows Petitioner seeks to represent a unit of employees directly involved in production and presentation of programs at Employer's radio and television station." The company contends that the unit should consist of all the employer's television and radio operations department excluding the office clerical employees, the janitorial employees, the guards, and the supervisors as defined in the Act. The company therefore claims that the Regional Director was wrong to exclude from the operations department one member of the television production crew and six traffic employees.

1. *The member of the Television Production Crew.* The disputed member of the television production crew was Tom Graham who according to the testimony of the operations manager spends 80% of his time delivering properties to the studio. The remainder of his time is spent running various errands. The company claims Graham's work as a prop man is essential to the production of a telecast. The general counsel maintains that Graham's duties are largely custodial. The Regional Director found that Graham's duties were not sufficiently concerned with the staging of productions to include him in the unit. This decision was concurred in implicitly by the trial examiner.

The company cites to us several previous Board decisions, notably Hampton Roads Broadcasting Corp., 100 N.L.R.B. 238 (1952) and Northwest Publications, 116 N.L.R.B. 1578 (1956), in which the Board included employees performing functions similar to Graham's in units that were essentially composed of production employees. In response, the Board cites WTAR Radio-TV Corp., 168 N.L.R.B. 976 (1967) where the Board excluded a prop man, who spent about 60% of his time as a porter, from a production unit. Both parties have made convincing arguments to show that the cases cited against them are distinguishable on the facts.

While we could engage in semantic acrobatics and attempt to square all the board decisions in these cases, we do not feel it is either necessary or appropriate. Although there is clearly an obligation on the Board to maintain a consistent approach in their unit determinations, we cannot lose sight of the fact that a determination of a unit's appropriateness will invariably involve factual situations peculiar to the employer and unit at issue. It is for this reason that the Board has been given great discretion in ruling on these matters. As this court recently stated:

> "It has long been axiomatic that the National Labor Relations Board has wide discretion in the selection of the appropriate bargaining unit and that a decision by the Board will not be disturbed unless arbitrary or capricious. NLRB v. Jones & Laughlin Steel Corp., 331 U.S. 416, 67 S.Ct. 1274, 91 L.Ed. 1575 (1947); Packard Motor Car Co. v. NLRB, 330 U.S. 485, 67 S.Ct. 789, 91 L.Ed. 1040 (1947); May Department Stores Co. v. NLRB, 326 U.S. 376, 66 S.Ct. 203, 90 L.Ed. 145 (1945); NLRB v. Li'l General Stores, 5 Cir. 1970, 422 F.2d 571."

N.L.R.B. v. Alterman Transport Lines, 5 Cir. 1972, 465 F.2d 950 (1972).

We find that none of the prior Board unit determinations cited by the company are so similar to this one as to require us to deem the exclusion of Graham an arbitrary departure from past precedent. In fact, we find the decision regarding Graham entirely consistent with the Board's more recent determination in *WTAR, supra.* In addition, from our own reading of the record, we cannot say that it was unreasonable to exclude Graham, whose job is largely custodial, from the determined unit, which is more intimately related to production.

2. *The Traffic Employees.* The primary function of the traffic employees is preparation, reproduction, correction and distribution of the daily program schedule. Again, both sides cite us cases where traffic employees either were

or were not included in production-type units. In particular, both sides cite *WTAR, supra,* in which traffic employees were included in the unit on the radio side but were excluded from the unit on the television side.

Again, we find none of the determinations cited by the parties directly controlling, particularly in view of the fact that from our reading of the cases, it is clear that traffic employees often have widely divergent functions at different stations. We cannot say the Board has been arbitrarily inconsistent. The question of whether traffic employees should be included because of continuity of interest is obviously close. In any event, both administrative expertise and judicial efficiency demand that we do not sit as a super-reviewing board to determine the correctness of every unit determination made by the Board. *See* Packard Motor Car v. N.L.R.B., *supra.* Our sole function on appeal is limited to ascertaining whether the Board's determination was arbitrary or capricious. N.L.R.B. v. Alterman, *supra.* The exclusion of the traffic employees, whose primary functions are essentially clerical, from a unit more intricately involved with actual production is not an abuse of discretion.

The company also contends that the unit was inappropriate because it was based solely on the extent of organization rather than on considerations of commonality. *Cf.* N.L.R.B. v. Metropolitan Life Insurance Co., 1965, 380 U.S. 438, 85 S.Ct. 1061, 13 L.Ed.2d 951. Section 9(c)(5) of the N.L.R.A. states, "In determining whether a unit is appropriate . . . the extent to which the employees have organized shall not be controlling." The Regional Director's unit determination, issued January 13, 1970, carefully considered many factors in set-

ting the appropriate unit. There is no indication whatsoever from his decision that the extent of organization played a controlling or for that matter *any* role in the determination. In accepting the Director's unit determination, the Board did nothing inconsistent with § 9(c)(5). The company's contention that prejudicial error was committed by the examiner in refusing to permit WKRG to develop evidence on the extent of organization is also rejected. If there are ample grounds to support the unit determination, which there were here, it is irrelevant that the unit sought by the union coincided with the extent of their organizational successes.

B. *The Union's Majority Status.* Essential to the Board's determination that a bargaining order was appropriate was its finding that the union had, in fact, achieved a valid card majority in November of 1969. The company raises objections to this finding and it is important that we carefully scrutinize the alleged card majority to insure that it was fairly obtained. To impose a union on a group of employees who have not in fact freely chosen to be so represented would be as much a violation of employee free choice as is an employer's use of its coercive powers to defeat a union that might otherwise have achieved majority status. *See, e. g.,* N. L.R.B. v. J. M. Machinery Corp., 5 Cir. 1969, 410 F.2d 587. Time, personnel changes, and other factors can make cards unreliable, but there must be proof that these were pervasive and existent and not purely theoretical.

The Supreme Court in *Gissel Packing, supra,* established the proposition that "cards, though admittedly inferior to the election process, can adequately reflect employee sentiment when that process has been impeded." 395 U.S. at 603, 89 S.Ct. at 1934.[6] Since the 8(a)(1) viola-

---

6. The general use and reliability of authorization cards as a basis for recognition has instigated much debate since the *Gissel* case. *E. g.,* Platt, The Supreme Court Looks at Bargaining Orders Based on Authorization Cards, *supra;* Comment, Employer Recognition of Unions on the Basis of Authorization Cards: The "Independent Knowledge" Standard, 39 U.Chi.L.Rev. 314 (1972); Note, N.L. R.B. v. Gissel Packing Co. Bargaining Orders and Employee Free Choice, 45 N.Y.U.L.Rev. 318 (1970).

tions discussed above have clearly impeded the election process, we are impelled to turn to the card majority to determine if that will provide us an accurate picture of employee sentiment prior to the unfair labor practices. The union is here alleging and the Board did find that 22 of the 34 employees in the unit signed valid authorization cards. In response, the company contends that a valid card majority never existed. The company's challenge is two-pronged. First, it is claimed that several of the cards should be disallowed because they were solicited by supervisors. Secondly, the company urges us to reject some of the cards because of misrepresentations made to employees concerning the purpose of the cards. We reject both attacks.

■ 1. *Solicitation by Supervisors.* In order for an authorization card to be a valid indicator of an employee's free choice, it is essential that the card not be tainted by the use of supervisory pressure in gaining the employee's signature. The general rule and rationale was stated by this court in N.L.R.B. v. American Cable Systems, Inc., 5 Cir. 1969, 414 F.2d 661, 664:

"It is well established that cards solicited by supervisory personnel may not be considered in determining a union's majority status. NLRB v. Hecks Inc., 4 Cir.1967, 386 F.2d 317, 322. The rationale for this rule is that a supervisor, through his power over the economic well-being of his charges, is in a position to exert undue and intrinsically coercive influence over their decisions as to whether or not to sign a card."

In the proceedings below, the trial examiner found that at least 6 of the 22 cards were tainted by improper supervisory influence. The Board, reversing the trial examiner, held that there was no showing of improper supervisory solicitation and that it was error for the trial examiner to throw out the cards. The facts surrounding the alleged unlawful solicitation are not in dispute,

and the controversy, as between the parties and as between the Board and the examiner, revolves solely around the appropriate standard to apply. Neither party would argue that cards *actually solicited* by supervisory personnel should be accepted, and the law clearly precludes such acceptance. *E. g.,* N.L.R.B. v. Hawthorne Aviation, 10 Cir.1969, 406 F.2d 428. The question that we must resolve is whether the supervisory involvement that admittedly took place constitutes, as a matter of law, impermissible supervisory "solicitation" that we condemned in *American Cable, I, supra.*

Unlike an 8(a)(1) determination, we are not privilege to generalize with respect to the supervisory influence. Although the general involvement of the supervisors is relevant to the determination of the validity of each individual card, in determining whether there was improper solicitation, we must split the atom, so to speak, and look at each alleged solicitation to see if the logically deducible reaction on the part of each alleged solicitee would support an inference of coercion or intimidation. It is necessary, therefore, to look at the facts of the supervisory influence pertaining to each disputed card to determine if that card was tainted by improper solicitation.

The cards of employees Goodman, Bagwell, Smith, King, Engle, and Davis were rejected by the trial examiner because of influence exerted by supervisors Keeney and Ellis. Both the examiner and the Board found that Keeney and Ellis were, in fact, supervisors, and the supervisory status of the two men is not at issue. *Cf.* N.L.R.B. v. American Cable, I, *supra.* The trial examiner found as follows as to each of the six rejected cards:

"Employee Max Goodman testified that he signed his card at a union meeting on November 19. Both Keeney and Ellis attended that meeting, and by their presence and remarks lent support to the organizational activity. At the meeting Keeney offered to lend

one of the employees $25 for payment to the Union on account of initiation fee, and Ellis, who had also made it clear that he supported the Union, asked several questions. We were told further that Keeney asked questions at this meeting. Witnesses testified that Goodman was present during various discussions with Ellis, all favoring the Union; one told us that he believed that one of these discussions preceded the November 19 meeting, another that such discussions took place both before and after he signed a card on that day. Max Goodman's card is rejected.

"Employee Bagwell testified that before he signed a card on November 13 Keeney and Formby spoke in support of the Union in the presence of several other employees, and that he gathered that Keeney was saying that it was the proper course to take to sign a card and also that it would be for the benefit of announcers and newsmen, that wages were not high enough, and that "there were some advantages to being represented by AFTRA." Bagwell's card is rejected.

"Employee Smith testified that he was not yet on the payroll and was working elsewhere but "had been hired" and was training for a job here when he signed a union card on November 20. He went on the payroll on November 30. Not yet privileged to discuss with Keeney or Ellis the advantages of unionization, Smith had attended the union meeting which they likewise attended the day before he signed his card; he recalled that one of the men present said that he had been made a supervisor. The impression given throughout is of an atmosphere which was tainted by indiscriminate support of the Union and the welcomed support of these supervisors. Smith's card is rejected.

"Employee King testified that Keeney was a personal friend of his and never solicited support for the Union; but that they had discussed it "mutually" before King signed his card and that while there was nothing "of any definite nature," both "seemed to feel the need for more representation . . . ." To argue that Keeney did not solicit King's card is hardly to meet the issue before us. Encouragement by a supervisor which, where that issue is raised, may warrant a finding of interference and even unlawful support against an employer invalidates a card. King's card is rejected.

"Employee Engle minimized his conversations with Keeney concerning the Union before he signed his card. He told us that Keeney "seemed to be in favor of a union at the station" and had said that "that might be the only way" to obtain better wages and other benefits. Engle was less reluctant to declare that both before and after he signed his card and in conversations with almost all employees Ellis declared that he was for union representation and "was talking it up." Engle's card is rejected.

"Employee Davis testified that he had a few conversations with Keeney, at least one of them before he signed on November 20. While Keeney never asked Davis to sign a card, he did point out that the Union would provide $5,000 of insurance and that it was worth the money to get such insurance at their age. Davis' card is rejected. It becomes unnecessary to consider questions which may be raised concerning validity of other cards." [7]

As to each of these six employees, it is apparent that when they signed the cards, they were aware that either Keeney or Ellis or both Keeney and Ellis were

7. The company is also questioning the validity of several other cards, not passed on by the trial examiner. The facts surrounding the solicitation of these other cards are similar to the six, supra, and it would serve no purpose to elaborate further on these in light of our determination that there was no 'solicitation' of the first six.

favorably disposed toward the union. It is equally apparent, however, that none of the employees was ever approached by Keeney or Ellis for the purpose of soliciting an authorization card, and that neither Keeney nor Ellis actively campaigned for the union.

The company persuasively argues that each of the cards should be invalidated because the inherently coercive nature of the supervisor employee relationship prevents an employee from making a freely reasoned decision not to sign a card if he knows that a supervisor is for the union. Under this interpretation, if the supervisor has made statements favoring the union and an employee has heard these statements, the employee will forever be precluded from signing a valid card subsequent to such exposure.

The Board, on the other hand, both in the decision below and in the general counsel's brief, argues for an interpretation that would limit the definition of improper "solicitation" to only those instances where it can actually be shown that the employee was faced with a fear of supervisory retaliation if he didn't sign a card.[8]

■ Although we are highly sensitive to the problem of supervisory influence, we cannot subscribe to a rule as broad as that advocated by WKRG. To subject otherwise valid authorization cards to such a sweeping disqualification would undermine a significant aspect of the *Gissel* mandate. *Gissel* clearly es-tablished that cards often can and sometimes must be relied upon as the most reliable indication of employee sentiment. *See* J. P. Stevens & Co., Inc., Gulistan Div. v. N. L. R. B., 5 Cir. 1971, 441 F.2d 514. We are not prepared to say, as the trial examiner implicitly did below, that authorization cards are so inherently unreliable that they must be disallowed whenever an employee perceives that a supervisor openly favors the union. It is actual pressure and coercion we are seeking to avoid by our rule disallowing cards tainted by supervisory influence. A mechanical rule that requires a finding of supervisory solicitation in situations such as we have here, where there is no hint of intimidation, is too broad.

■ Before the Board invalidates a card because of prounion supervisory solicitation, there must be some showing that the signing employee was subject to a reasonable apprehension that his failure to sign could have adverse consequences. Certainly a direct solicitation by a known supervisor could give rise to the necessary inference of reasonable apprehension. *E. g.,* N. L. R. B. v. Hecks, Inc., *supra,* 386 F.2d at 321. Similarly, active campaigning for the union by the supervisor even without actual solicitation, could in many circumstances necessitate a finding of improper solicitation. *See* Turner's Express, Inc. v. N. L. R. B., *supra;*[9] N. L. R. B. v. Heck's, Inc., *supra,* 386 F.2d at 322.

---

8. In the Board's opinion below and in the general counsel's brief, it is argued that the anti-union attitude of the company hierarchy should be considered a strong counter-weight to a claim of improper pro-union supervisory influence. Although this factor might be relevant in a situation where the employee actually knew that the supervisor in question had absolutely no retaliatory power, this will rarely be the case. We are in substantial agreement with the Third and Fourth Circuits in their belief that a reasonable fear of supervisory retaliation can be present even if the company hierarchy has openly opposed the union. N.L.R.B. v. Heck's Inc., 4 Cir. 1967, 386 F.2d 317; Turner's Express, Inc. v. N.L.R.B., 4 Cir. 1972,

456 F.2d 289; N.L.R.B. v. Boyer Brothers, 3 Cir. 1971, 448 F.2d 555.

9. The factual situation in the *Turner's Express* case illustrates the dangers of supervisory influence and by contrast, it shows how insignificant the influence was at WKRG. There the Fourth Circuit found, 456 F.2d at 292:

"The present record is replete with actions and statements of Tebo and Robbins in favor of the Union. It appears that they were largely responsible for bringing in the organizer to commence the Union effort. They interrogated employees as to whether they intended to sign Union authorization cards and advised some they would be 'crazy' not

■ Supervisors Keeney and Ellis unquestionably manifested a favorable attitude towards the union to all of the employees who signed the disputed cards. The manifestations of supervisory union support did not, however, rise to the level of actual solicitation or active campaigning that is needed for a finding of improper solicitation. *See* N. L. R. B. v. Kane Bag Supply Co., 4 Cir. 1970, 435 F.2d 1203; N. L. R. B. v. Ozark Motor Lines, 8 Cir. 1968, 403 F. 2d 356. We are well aware that subtle supervisory pressures can be brought to bear that would fall short of actual solicitation or active campaigning. Such pressures cannot and should not be ignored when passing on the validity of cards, and certainly where the record supports an inference of intimidation resulting from such pressures, the cards would be subject to disallowance by the Board. We do not, however, believe there is any evidence in the record before us that any such subtle pressures were present.

■ There must be a more substantial exhibition of pressure than a passing remark or a statement of prounion conviction. So long as nothing in the words, deeds, or atmosphere of the alleged "solicitation" contain the seeds of potential reprisal, punishment, or intimidation, the involvement of the supervisors does not rise to the levels of supervisory "solicitation" that we condemned in *American Cable I, supra.* Here the supervisors attended a few union meetings and at various times made rather tame statements regarding their approval of the union. There is not a sufficient showing to throw out any of the cards, and the Board was correct in refusing to allow the minimal supervisory participation in this organization drive to frustrate the union's otherwise valid majority. In this regard we feel that the Board's observations in an earlier case approved by the District of Columbia Circuit are instructive. In N. L. R. B. v. Aero Corp., D.C.Cir., 1966, 363 F.2d 702, 708, Judge Leventhal, faced with a similar claim that the Board had erred in recognizing a card majority that was allegedly tainted by supervisory participation, said:

"The Board reasoned that to permit an employer to rely on the participation of marginal supervisory personnel in the Union's campaign to justify after the fact its refusal to bargain with the Union would encourage it to allow such participation in hopes of later, in the event of a Union majority, obtaining an order either setting aside an election or upholding the refusal to bargain. This seems to us a permissible ruling in determining the application of the Act, where the complaint does not charge Company domination of a union or efforts to further the cause of a particular union."

The Board found in this case that none of the challenged cards were obtained as a result of supervisory pressure.[10] Although we are not in total agreement with the standards applied by the Board,[11] we find that its ultimate

---

to sign. They questioned others as to how they intended to vote, warned that if the employees voted against the Union things were going to get tough, and they would start 'paying for it' after the election. Both supervisors told employees that they would get higher wages if they voted for the Union and that the Union would mean more money and benefits. Robbins advised certain employees 'they should vote for the Union if they wanted protection'. Tebo threatened a driver: 'When the Union gets in, we are going to take care of you', and told others 'if you don't vote for the

Union, your tail ought to be kicked off the premises'."

10. The different results reached by the trial examiner and the Board on this issue were caused primarily by the application of differing legal standards. This is not the kind of determination where, because of demeanor-type evidence, great deference must be paid to the trial examiner's findings. *Cf.* Universal Camera v. N.L.R.B., 1951, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456.

11. *See* note 8, *supra.*

factual conclusion is well supported by the record even without considering the fact of official company animus to the union. We hold that none of the cards was improperly solicited by supervisors.

■ 2. *Representations During Solicitation.* The company further attacks the validity of the card majority on the ground that the signers of several authorization cards were told that by signing the card they were petitioning for an election or inviting an AFTRA representative to explain AFTRA to them. The six employees whose cards are questioned by the company testified as follows:

1. Employee Bauman: He testified that he signed because he was told if he signed somebody would "come to town to explain what the Union was about."

2. Employee Goodman: He testified that he signed after someone announced at the union meeting that if enough people signed, they could petition for an election.

3. Employee Smith: He testified that he only signed with the intention that "it was not his vote" and that his vote was secret. His other testimony as to what he was told when he signed was very vague and uncertain.

4. Employee Land: He testified that at the union meeting he attended an election was discussed and he was told that he would have an opportunity to vote in private.

5. Employee Godwin: He testified that the solicitor of his card told him that the card "was an initial application and it did not necessarily indicate that he wanted to become a member of AFTRA, but that it was an indication to show that he was interested in hearing

what AFTRA had to say. Godwin testified that he had read the card before he signed it.

6. Employee Hodges: He testified that at the union meeting there was a discussion where it was said that there had to be a certain number of cards in order to have an election.

The general counsel asserts that where the authorization cards are wholly unambiguous on their face,[12] as here, because they designate the union as "exclusive agent for collective bargaining," the cards should not be invalidated because the party soliciting the card also mentions to the signer that the cards will be used for an election or other purpose.

The trial examiner, although he did not devote much attention to this question, specifically rejected the company's contention in a footnote:

"I reject the Company's argument that despite the clearly stated designation of the union, some of the cards should be rejected as indicating only a desire to have an election or a visit to Mobile by a Union representative."

Although the Board did not explicitly pass on this matter, it implicitly accepted the examiner's finding by holding that a valid majority was obtained.

The company's contention that the cards should be invalidated is answered by the Supreme Court's decision in N. L. R. B. v. Gissel Packing Co., 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969), where the Court said as to single purpose cards the following:

"[E]mployees should be bound by the clear language of what they sign unless that language is deliberately and clearly canceled by a union adherent with words calculated to direct the signer to disregard and forget the lan-

12. The card stated as follows:
"I hereby designate the American Federation of Radio and Television Artists as my exclusive agent for collective bargaining purposes in any and all matters dealing with the radio industry, televi- sion, records, electrical transcriptions, any other means for mechanical reproduction and any other matters or industries within the jurisdiction of the said Federation."

guage above his signature. There is nothing inconsistent in handing an employee a card that says the signer authorizes the union to represent him and then telling him that the card will probably be used first to get an election. . . . We also accept the observation that employees are more likely than not, many months after a card drive and in response to questions by company counsel, to give testimony damaging to the union, particularly where company officials have previously threatened reprisals for union activity in violation of § 8(a)(1). We therefore reject any rule that requires a probe of an employee's subjective motivations as involving an endless and unreliable inquiry."

395 U.S. at 606–608, 89 S.Ct. at 1936. In the recent case of J. P. Stevens & Co., Inc., Gulistan Division v. N. L. R. B., 5 Cir. 1971, 441 F.2d 514, this court quoted N. L. R. B. v. Gissel Packing Co., 395 U.S. 607–608, 89 S.Ct. 1918 where the Court said:

"[M]ere mention that the cards may be used to secure an election is not sufficient to vitiate their efficacy. Such cards can be disregarded only where Union organizers solicit them on the explicit or indirectly expressed representation that they will use such cards only for an election."

An examination of the testimony of the six employees in the present case shows that none of the employees was told that the cards they were signing would be used only for an election. The testimony of all the employees except Godwin merely shows what their subjective motivation was in signing the cards. An examination of the subjective motivation of the employees would be contrary to the Court's admonition in *Gissel. See* J. P. Stevens & Co., Inc., Gulistan Division v. N. L. R. B., *supra,* 441 F.2d 524.

Employee Godwin, for example, testified that he read the card, but he claims that he was told it was only an initial application. In J. P. Stevens & Co., Inc., Gulistan Div. v. N. L. R. B., *supra,* at 524, the court said that the reviewing court should "[view] with a critical eye post-solicitation statements contrary to the language of the cards."

Our assessment of the legal effect of the challenged misrepresentations is very much colored by the fact that in *Gissel* the representations were at least as misleading as those that occurred in this case.[13] The Court rejected the challenge to the cards in *Gissel* and we likewise reject the company's challenge here.

In J. P. Stevens, Gulistan Div., v. N. L. R. B., *supra,* 441 F.2d at 523, we said:

"[W]here the cards are, as here, unambiguous on their face, the circumstances must show clearly and convincingly that they were secured through coercion or misrepresentation before they may be disregarded."

There is substantial evidence in the record as a whole to support the Board's finding of a valid majority and *Gissel* compels us to leave that finding undisturbed.

C. *The Remedy—The Appropriateness of a Bargaining Order.* In N. L. R. B. v. American Cable Systems, *supra,* 414 F.2d at 668, we enunciated the standard for determining when, under *Gissel,* a bargaining order may issue in this type of case:

"(a) the union had valid authorization cards from a majority of the employees in an appropriate bargaining unit; (b) the employer's unfair labor practices, although not 'outrageous' and 'pervasive' enough to justify a bargaining order in the absence of a card majority, were still serious and extensive; (c) the possibility of eras-

---

13. In *Gissel,* the employees were told, "one or more of the following:
(1) that the card would be used to get an election (2) that he had the right to vote either way, even though he sign-
ed the card (3) that the card would be kept secret and not shown to anybody except to the Board in order to get an election.". 395 U.S. at 584, n. 5, 89 S. Ct. at 1925.

ing the effects of past practices and of ensuring a fair election (or a fair rerun) by the use of traditional remedies, though present, is slight; and (d) employee sentiment can best be protected in the particular case by a bargaining order." [14]

We are cognizant of the long line of post-*Gissel* cases that have refused to enforce bargaining orders on the ground that employee free choice would be better served by an election. *E. g.* American Cable II, *supra*; L. C. Cassidy & Son v. N. L. R. B., 7 Cir. 1969, 415 F.2d 1358. We are also in full agreement with Judge Friendly's opinion in N. L. R. B. v. General Stencils Inc., 2 Cir. 1971, 438 F.2d 894, that the Board must be able to justify the issuance of a bargaining order in cases where the need for such an order seems less compelling than in other cases where the Board has refused orders. We do not, however, feel that these cases in any way preclude the enforcement of the Board's order. In none of the cited cases where enforcement was denied was the need for a bargaining order as compelling as in the case before us.

The Board's finding as regards the appropriateness of the bargaining order was as follows:

The Union's request for recognition and bargaining was rejected by the Respondent. After the advent of the Union and after its request for bargaining, the Respondent embarked upon a campaign of unlawful conduct to undermine its employees' support for the Union. Thus, Respondent maintained and enforced an unlawful no-solicitation rule, coercively interrogated and solicited grievances from employees, and promised and granted wage increases and other benefits to its employees. The first in a series of

benefits was granted on November 20. After the Union had achieved its majority status and requested recognition and filed its petition for an election, further benefits were granted on December 13 and 28. On February 9, 10, and 11, 1970, before the election scheduled for February 12, the Respondent sent a series of letters to the employees reminding them of the earlier benefits granted and promising them more benefits in the future. The Union lost the election by one vote.

In our opinion, the Respondent's unfair labor practices were so extensive that they had the tendency to undermine the Union's majority strength and impede the Board's election process. We find it unlikely that the lingering effects of the Respondent's unlawful conduct would be neutralized by resort to conventional remedies which would ensure a fair rerun election. We believe that employee sentiment, once expressed through the authorization cards, would, on balance, be better protected by the issuance of a bargaining order.

The factual background upon which the Board predicated the § 8(a)(5) violation is typical of the scenario which the Supreme Court said warranted a bargaining order in *Gissel*. We find that all of the requirements laid down in *American Cable I* are fully satisfied. Prior to any employer interference, the majority of unit employees expressed a desire to be represented by the union. It was only after the numerous unfair labor practices enunciated earlier that the union lost the election, and even then it was by only one vote. Certainly, the massive, calculated granting of benefits, undertaken by the company to counter the organizational drive must have

14. The bargaining order was ultimately denied in American Cable II, 5 Cir. 1970, 427 F.2d 446, cert. denied 400 U.S. 957, 91 S.Ct. 356, 27 L.Ed.2d 266, for the reason that the Board had "refused to consider evidence offered by the Company that a complete turnover in employees and

the departure of the only management official involved in the unfair labor practices made a free election possible at that time." 427 F.2d 448. There was no such showing made by WKRG and therefore *American Cable II* is in no way controlling.

**1320**

had the foreseeable effect of removing the union's raison d'etre in the eyes of many of the employees. Unless it can be said that the present constituency of the company is capable of a real freedom of choice, the card majority should not be subordinated to a potentially tainted election. On this record, which indicated that the rationale of the union was destroyed through belated benefit-granting and the organizational effort was retarded by unfair labor practices, to say that the Board erred in holding that a fair election could not be held would hardly do justice to the values of free choice that *Gissel* seeks to protect.

The Board's finding that freedom of choice would best be served through the issuance of a bargaining order is well supported by the record. As we held in J. P. Stevens, *supra,* 441 F.2d at 528, the Board must be given "peculiar respect" in its determination of the appropriate remedy:

> " 'It is for the Board and not the Courts * * * to make [the] determination [of remedies], based on its estimates as to the effects on the election process of unfair labor practices of varying intensity. In fashioning its remedies under the broad provisions of § 10(c) of the Act * * * the Board draws on a fund of knowledge and expertise all its own, and its choice of remedy must therefore be given *special* respect by reviewing Courts.' "

(citing Gissel Packing, 395 U.S. 612, n. 32, 89 S.Ct. 1918, 23 L.Ed.2d 547).

Though the subjectives of these controversies are rough grist for the judicial mill, we are convinced that the Board milled the facts and the law correctly, and the Board's order is enforced in its entirety.

Enforced.

GODBOLD, Circuit Judge (specially concurring):

I concur in the result.