[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
AUGUST 24, 2001
THOMAS K. KAHN
CLERK

_____

No. 00-14015

_____

NLRB No. 10-CA-30575

THE WALDINGER CORPORATION,

Petitioner-Cross-Respondent,

versus

NATIONAL LABOR RELATIONS BOARD,

Respondent-Cross-Petitioner,

LOCAL 72 OF THE UNITED ASSOCIATION OF
JOURNEYMEN AND APPRENTICES OF THE
PLUMBING AND PIPE FITTING INDUSTRY,

Intervenor.

_____

Petition for Review of an Order and Cross Application for Enforcement
of the National Labor Relations Board

_____

(August 24, 2001)

Before BIRCH, WILSON and FARRIS*, Circuit Judges.

BIRCH, Circuit Judge:

_____

*Honorable Jerome Farris, U.S. Circuit Judge for the Ninth Circuit, sitting by designation.

The Waldinger Corporation seeks relief from an order of the National Labor Relations Board (the "Board"), which found that Waldinger engaged in an unfair labor practice by improperly withdrawing its voluntary recognition of Local 72 of the United Association of Journeymen and Apprentices of the Plumbing and Pipefitting Industry (the "union") and refusing to negotiate a labor contract with the union. The Board cross-petitions for enforcement of its order. Waldinger admits that it withdrew recognition and refused to negotiate with the union. The only issue before us is whether Waldinger's actions were justified because of improper supervisory influence over employees who signed authorization cards for union representation. The Board found no supervisory taint, and, because that decision was supported by substantial evidence, we AFFIRM.

## I. BACKGROUND

The material facts of this case are not in dispute. Waldinger provides heating and air conditioning services to commercial and industrial businesses. In July 1997, Waldinger employed thirteen service technicians in its Smyrna, Georgia office, including Arthur Peterson, who worked as a technician and also supervised the other twelve technicians. Waldinger was a signatory to the National Mechanical Equipment Service and Maintenance Agreement, a pre-hire agreement

with the International Union affecting the thirteen service technicians.[1] On 11 June 1997, Waldinger notified the International Union that it was terminating the agreement effective 16 August 1997. The International Union notified Local 72 of the termination and suggested that the union try and obtain a local agreement if one was not already in place. Union organizer Clyde Jones contacted Waldinger's president, Thomas Koehn, and received a negative impression of Waldinger's willingness to sign a local agreement. Jones then sought to organize the service technicians and obtain voluntary recognition of the union by Waldinger.

To that end, Jones contacted Peterson and another service technician who was a union member and asked them to notify Waldinger's service technicians that a meeting would be held at the union hall on 31 July 1997. Peterson informed some of the technicians of the meeting and told them it was important that they be there. All thirteen technicians attended the meeting. Union officials informed the group that Waldinger had terminated its agreement with the International Union. Union officials discussed the union benefits plan, answered questions and

---

[1]The parties stipulated that the relevant unit was:

All full-time and part-time HVAC service technicians employed by [Waldinger] out of its 1600 Wilson Way, Suite 12, Smyrna, Georgia branch office, but excluding all office clerical employees, sales employees, . . . guards and supervisors as defined in the Act.

Waldinger Corp., 331 NLRB No. 70, n. 5 (June 30, 2000).

discussed the benefits of union organization. Several employees voiced their opinions, both for and against the union. Peterson spoke in favor of the union, noting that the technicians did not know what their pay and benefits would be without the union.[2] The union representatives instructed the group to vote on whether they wanted to be represented and then left the room. Peterson remained. More discussion followed and then a voice vote was taken by going around the table. The union representatives returned to the room and distributed authorization cards. Nine of thirteen technicians signed cards. Later that evening, a technician called the Smyrna branch manager, William McMillen, at home, related what had occurred at the meeting and informed him that nine technicians had signed authorization cards.

The next day, Jones went to McMillen's office, informed him that a majority of the technicians had signed authorization cards and presented a demand letter for recognition of the union as the collective bargaining agent for the unit. McMillen had an opportunity to view the cards.[3] McMillen agreed to have Waldinger meet

---

[2]Waldinger had decided to change the employees' pay and benefit plan, but intentionally did not inform Peterson of what the new plan would be.

[3]Jones testified at the hearing before the administrative law judge ("ALJ") that he handed the cards to McMillen and that McMillen fanned the cards before returning them to Jones. The ALJ credited this testimony. Either way, McMillen had the opportunity to review the cards if he had so desired.

4

and negotiate with the union. On 4 August, Waldinger's president sent a letter to the union agreeing to conduct negotiations and asking to see a copy of any proposed agreement the union might wish to present.

Before negotiations could begin, McMillen was contacted by an employee who changed his mind about wanting union representation. McMillen drafted a petition for the employee and a majority of the unit technicians signed the petition. On 11 August, after receiving the petition and learning more about Peterson's role in the union meeting, Koehn withdrew recognition from the union and refused to negotiate. Waldinger also ceased contributing to the union pension fund on 11 August. On 18 August, Waldinger unilaterally raised pay and increased other benefits for unit technicians.

The ALJ found that Peterson was a supervisor, but that his involvement did not taint the signing of representation cards because there was no evidence of coercion by him. The ALJ also found that McMillen, the branch manager, voluntarily recognized the union on 1 August and that this recognition was confirmed by Koehn's letter of 4 August. Because an employer is required to negotiate in good faith for a reasonable period of time after voluntary recognition of a union, the ALJ found that Waldinger engaged in an unfair labor practice when it withdrew recognition from the union and unilaterally altered wages and benefits

5

without negotiating with the union. The NLRB affirmed this decision, and Waldinger appeals.

## II. DISCUSSION

We will not reverse a decision of the Board that is supported by substantial evidence. 29 U.S.C. § 160(e). "We may not override the Board's choice between two fairly conflicting views." Cooper/T. Smith, Inc. v. NLRB, 177 F.3d 1259, 1269 (11th Cir. 1999). Waldinger asserts that the authorization cards were tainted by a supervisor's influence because Peterson attended the union meeting and spoke out in favor of signing cards. The company also argues that the Board used an incorrect legal standard to determine whether supervisory taint existed. Therefore, before we can determine if the Board's decision is supported by substantial evidence, we must first decide whether the proper legal standard was used.

Supervisory taint will invalidate an authorization card where the supervisor's actions either (1) convey a false impression that the employer company favors the union, or (2) raise the possibility of coercion and fear of retaliation because of the supervisor's position of authority over the affected employees. Millsboro Nursing and Rehab. Ctr., 327 NLRB 879, 879 (Mar. 17, 1999) (internal citations omitted). This two part test "has been firmly entrenched in Board precedent for more than a quarter of a century . . . [and] has been repeatedly approved by the courts." Id. See

6

also Orlando Paper Co., Inc., 197 NLRB 380, 387 (1972), enforced, 480 F.2d 1200, 1202 (5th Cir. 1973). In determining whether the authorization cards were tainted, the Board asked whether Peterson's conduct implied that Waldinger favored the union or, alternatively, whether his conduct raised the concern that employees had been coerced into signing cards by fear of retaliation by Peterson. Therefore, the Board used the proper standard to evaluate whether the authorization cards were tainted by Peterson's actions.

The Board's decision was also supported by substantial evidence. At the union meeting, the technicians were informed by union officials that Waldinger had cancelled its agreement with the International Union. There could have been no confusion regarding Waldinger's desire to terminate its relationship with the union. The Board's decision that a false implication of employer support was not present is supported by substantial evidence.

Waldinger asserts, however, that the second prong of the test for supervisory taint was met because employees were coerced into signing authorization cards by Peterson's vocal support for the union. An authorization card should reflect an employee's free choice, and "it is essential that the card not be tainted by the use of supervisory pressure." NLRB v. WKRG-TV, Inc., 470 F.2d 1302, 1313 (5th Cir.

1973).  However, a supervisor's support for the union, without more, is not sufficient to demonstrate taint.

> So long as nothing in the words, deeds, or atmosphere of the alleged 'solicitation' contain the seeds of potential reprisal, punishment, or intimidation, the involvement of the supervisors does not rise to the levels of supervisory 'solicitation' that we condemn[].

Id. at 1316.  See also NLRB v. San Antonio Portland Cement Co., 611 F.2d 1148, 1151 (5th Cir. 1980) (per curiam) ("[T]his Circuit has clearly held that not just any advocacy of a union by a supervisor rises to the level of supervisory pressure or coercion.").

In this case, Peterson vocally advocated the union and was present when a voice vote was taken.  He did not, however, initiate the meeting or pass out authorization cards.  Several employees spoke out against the union at the meeting and several chose not to sign authorization cards.  No testimony was presented that any employee felt pressured or coerced into signing a card.  Accordingly, the Board's decision is AFFIRMED.

Waldinger also asks us to find that the Board's order impermissibly requires Waldinger to make retroactive payments into the union's fringe benefits fund.  We decline to address this issue, as it is not yet ripe for review.  Neither the ALJ's or the Board's opinions require any payments into the fund.  Rather, the issue was deferred to the compliance stage of the proceeding which has not yet commenced.

## III. CONCLUSION

Because we find that the Board used the proper legal standard and its decision was supported by substantial evidence, we AFFIRM and the NLRB's cross-petition to enforce its order is GRANTED.